**Clifford B. MEACHAM; Thedrick L. Eighmie; and Allen G. Sweet, all individually and on behalf of all other persons similarly situated; and**

**James R. Quinn, PhD; Deborah L. Bush; Raymond E. Adams; Wallace Arnold; William F. Chabot; Allen E. Cromer; Paul M. Gundersen; Clifford J. Levendusky; Bruce E. Palmatier; Neil R. Pareene; William C. Reynheer; John K. Stannard; David W. Townsend; and Carl T. Woodman, Plaintiffs,**

v.

**KNOLLS ATOMIC POWER LABORATORY, aka KAPL, Inc.; Lockheed Martin, Inc.; and John J. Freeh, individually and as an employee of KAPL and Lockheed Martin, Defendants.**

**James R. Quinn, PhD, Plaintiff,**

v.

**Knolls Atomic Power Laboratory, Inc., aka Kapl, Inc.; Lockheed Martin, Inc.; and John J. Freeh, individually and as an employee of KAPL and Lockheed Martin, Defendants.**

**Nos. 97–CV–12 (DRH), 97–CV–45 (DRH).**

United States District Court, N.D. New York.

Feb. 13, 2002.

Berger & DuCharme, LLP (John B. DuCharme, Joseph C. Berger, of counsel), Clifton Park, NY, for Plaintiffs.

Epstein Becker & Green, P.C. (Michael R. Zeller, Alesia J. Kantor, of counsel), New York City, Nixon Peabody LLP (John E. Higgins, of counsel), Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

HOMER, United States Magistrate Judge.

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | Introduction | | 201 |
| II. | Background | | 201 |
| | A. | The IRIF | 201 |
| | B. | The Trial | 203 |
| III. | Defendants' Motion | | 204 |
| | A. | Timeliness | 204 |
| | B. | Liability | 206 |
| | | 1. Plaintiffs' Prima Facie Case | 206 |
| | | a. Facially Neutral Employment Practice | 207 |
| | | b. Sufficiency of Plaintiffs' Statistical Evidence | 208 |
| | | c. Evidence of Multiple Reqression Analyses | 211 |
| | | 2. Defendants' Burden of Production | 212 |
| | | 3. Discrimination | 214 |
| | | 4. Willfulness | 215 |
| | | 5. Liability Under the HRL | 216 |
| | C. | Damages | 217 |
| | | 1. Back pay | 218 |
| | | 2. Front pay | 219 |
| | | 3. Emotional distress | 219 |
| | | 4. Individual Plaintiffs | 221 |
| | | a. Raymond E. Adams | 221 |
| | | b. Wallace Arnold | 221 |
| | | c. Deborah L. Bush | 222 |
| | | d. William R. Chabot | 224 |
| | | e. Allen E. Cromer | 224 |
| | | f. Thedrick L. Eighmie | 225 |
| | | g. Paul M. Gundersen | 225 |
| | | h. Clifford J. Levendusky | 226 |
| | | i. Clifford B. Meacham | 227 |
| | | j. Bruce E. Palmatier | 228 |
| | | k. Neil R. Pareene | 229 |
| | | l. William C. Reynheer | 231 |
| | | m. John K. Stannard | 232 |
| | | n. Allen G. Sweet | 233 |
| | | o. David W. Townsend | 234 |
| | | p. Carl T. Woodman | 235 |
| IV. | Plaintiffs' Motions | | 237 |
| | A. | Prejudgment Interest | 237 |
| | B. | Postjudgment Interest | 238 |

 C. Upward Adjustment for Increased Taxes ................................238
 D. Attorneys' Fees and Costs .............................................238
 1. Attorneys' Fees..................................................239
 a. Hours Expended ............................................239
 b. Hourly Rates ..............................................241
 c. Adjustments ...............................................241
 2. Costs............................................................242
V. Conclusion .......................................................·.........245

## I. Introduction

The twenty-six plaintiffs, all over age forty, were employed by defendant Knolls Atomic Power Laboratory, Inc. ("KAPL") until 1996 when their employment was terminated in an involuntary reduction-in-force (IRIF). Plaintiffs then commenced this class action [1] against KAPL, Lockheed Martin, Inc., KAPL's parent company, and John J. Freeh ("Freeh"), KAPL's President and General Manager, alleging that their terminations violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the New York Human Rights Law (HRL), N.Y. Exec. Law § 290 *et seq.* (McKinney 2001).[2] Plaintiffs allege that the violations resulted from both disparate treatment and disparate impact. Following trial, a jury returned verdicts in favor of the plaintiffs on their disparate impact theory, in favor of defendants on the disparate treatment theory, and awarded damages totaling $5,077,285.33. Judgment was entered on the verdicts. Am. J.· (Docket No. 133).

Presently pending are (1) defendants' motion for judgment as a matter of law, a new trial and remittitur (Docket No. 137); (2) plaintiffs' motion for prejudgment interest, postjudgment interest and an upward adjustment of damages for increased taxes (Docket No. 138); and (3) plaintiffs' motion for attorneys' fees and costs (Dock-

et No. 197). For the reasons which follow, defendants' motion for judgment as a matter of law is denied and their motion for a new trial and remittitur is granted in part and denied in part. Plaintiffs' motion for prejudgment interest is granted in part and denied in part, their motion for postjudgment interest is granted and their motion for an upward adjustment of damages for increased taxes is denied. Finally, plaintiffs' motion for attorneys' fees and costs is granted.

## II. Background

### A. The IRIF

KAPL operates a laboratory to design, build and test prototype naval nuclear reactors and to train United States Navy personnel in their operation and maintenance. KAPL employs approximately 2,700 individuals principally at sites in Niskayuna and West Milton, New York, both within forty miles of Albany. KAPL operates the laboratory under a "cost-plus" contract between the United States Department of Energy (DOE) and Lockheed Martin by which KAPL receives reimbursement for expenses it incurs plus a percentage of those expenses. The contract is overseen by DOE's Schenectady Naval Reactors Office (SNR).

---

**1.** Two additional employees, Ronald G. Butler, Sr. and Janice M. Polsinelle, were members of the class which brought this action. However, the jury found in favor of the defendants on their claims.

**2.** An "opt in" class action may be maintained under the ADEA in accordance with section 16(b) of the Fair Labor Standards Act, *see* 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b)); *Pandis v. Sikorsky Aircraft Div.,* 431 F.Supp. 793, 796 (D.Conn.1977).

The twenty-six prevailing plaintiffs were employed in exempt, or salaried, positions in various of KAPL's sixteen sections.[3] The sixteen sections were headed by managers who reported directly to Freeh. Each section was also subdivided into sections headed by subsection managers. Certain subsections were further subdivided into units headed by unit managers.

In March 1994, KAPL began formulating a plan to reduce its workforce by approximately 140 positions in accordance with budget projections coordinated between KAPL and SNR. KAPL conceived and adopted a "Workforce Adjustment Plan" (WAP) to achieve the desired reduction in two stages. The first was the "Voluntary Separation Plan" (VSP) by which KAPL offered early retirement to employees with at least twenty years of service in return for the payment of $20,000. The second was the IRIF. In the Fall of 1995, KAPL offered the VSP to its employees. Ultimately, 107 employees applied and were approved for the VSP.

In November 1995, KAPL proceeded with the IRIF.[4] First, KAPL identified the positions within the sixteen sections which were to be eliminated. This "excess skills analysis" sought to determine those positions which KAPL could terminate with the least adverse effect on KAPL's operations. These included, for example, specialized positions in reduced demand. After the employees in those excess positions were identified, the section, subsection and unit managers were directed to evaluate the individuals in those positions by a prescribed process which resulted in the assignment of a numerical score for each employee subject to the IRIF.

First, the managers assigned scores of from zero to ten points to each such employee in four categories: length of service, work performance, criticality to KAPL's operations, and the flexibility of their talents. For length of service, each employee subject to the IRIF was given one point for every two years of service to a maximum of ten points.[5] For work performance the subject employees were assigned scores based on their previous two performance evaluations.[6] For criticality and flexibility, subject employees were assigned ratings points in each category by their managers.

Second, subject employees were then placed on matrices grouped by category of excess skill and were ranked according to their numerical scores. The employees with the lowest scores on the matrices were selected for the IRIF.[7] KAPL made efforts to place these employees in other vacant positions within KAPL before final decisions were made. On December 6, 1995, KAPL served notices on thirty-one exempt employees and five non-exempt employees that their employment was terminated in the IRIF effective January 12, 1996.[8] Because of KAPL's security con-

---

3. Butler and Polsinelle, the two nonprevailing plaintiffs, were employed in non-exempt, or hourly, positions.

4. At the same time, KAPL was recruiting and hiring thirty-five new exempt employees, virtually all of whom were under forty years old.

5. Employees were credited with service to General Electric Company, the parent company of KAPL prior to Lockheed Martin.

6. Performance evaluations were required to be done by an employee's manager every twelve to fourteen months.

7. Where employees on the same matrix were tied, the managers performed "paired comparisons" of those employees in the various categories to break the ties.

8. Plaintiff Allen E. Cromer was on disability leave on December 6, 1995. The termination of his employment was extended to May 17, 1996 when he was cleared to return to work.

cerns, terminated employees were given three hours after receiving their notice to pack their personal belongings and were then escorted off the premises.

At the time of the IRIF, KAPL employed 2,063 individuals in exempt positions after the VSP. Of those, 1,203, or fifty-eight percent, were forty years of age or older [hereinafter "older employees"]. Of those, 245 were considered for the IRIF. Of the 245, 179, or seventy-three percent, were older employees. Of the thirty-one exempt employees selected for the IRIF, thirty, or ninety-seven percent, were older employees.[9] The terminated employees received certain benefits, including severance totaling one week of pay for every year of service to a maximum of twenty-six weeks; continuation of benefits for one year; and the free use and services of an employment counseling service outside KAPL.

### B. The Trial

Plaintiffs commenced this action on January 6, 1997.[10] Defendants KAPL and Lockheed Martin were named in the ADEA cause of action and all three defendants were named in the HRL cause of action. Plaintiffs alleged two theories of liability under both the ADEA and the HRL—disparate treatment and disparate impact. Compl. (Docket No. 1). Defendants' motion to bifurcate the trial between liability and damages was granted, Docket No. 59, and the trial on liability

commenced before a jury on June 20, 2000. On July 26, 2000, the jury returned a verdict finding under plaintiffs' disparate impact theory that the defendants had discriminated against the twenty-six exempt employees and that such discrimination had been willful. The jury found in favor of defendants on plaintiffs' disparate treatment theory of discrimination. Docket No. 86.

Prior to the commencement of the damages phase of the trial, eight plaintiffs [11] settled their claims with defendants. *See* Docket Nos. 111–17 & 121. The trial on damages commenced before the same jury on September 19, 2000. Evidence was presented in four groups of plaintiffs with four or five plaintiffs in each group and with the jury returning a separate verdict for each group. The verdict for the final group was returned on November 22, 2000. The jury's verdicts on damages awarded the remaining eighteen prevailing plaintiffs total damages as follows:

| Plaintiff | Total Amount Awarded |
| --- | --- |
| Raymond E. Adams | $ 411,823.13 |
| Wallace Arnold | $ 526,825.81 |
| Deborah L. Bush | $ 246,509.50 |
| William R. Chabot | $ 119,734.85 |
| Allen E. Cromer | $ 109,386.97 |
| Thedrick L. Eighmie | $ 91,445.00 |
| Paul M. Gundersen | $ 160,218.71 |
| Clifford J. Levendusky | $ 190,605.55 |
| Clifford B. Meacham | $ 125,000.00 |
| Bruce E. Palmatier | $ 332,126.09 |
| Christine A. Palmer [12] | $ 78,812.50 |

9. Five non-exempt employees were also selected for the RIF. Three were over forty years of age.

10. Plaintiff James R. Quinn commenced a separate action on January 10, 1997 alleging the same claims as well as a claim for breach of an employment contract. In the Memorandum–Decision and Order of United States District Judge Lawrence E. Kahn filed March 20, 1998, the defendants' motion to dismiss the contract claim was granted. *Quinn* Docket No. 15. The two actions were consolidated

for all other purposes. *Id.; see also Meacham* Docket No. 15.

11. Frank A. Paxton, Bruce E. Vedder, David J. Kopmeyer, Arthur J. Kaszubski, James S. Chambers, Teofils F. Turlais, Hildreth E. Simmons and Henry Bielawski.

12. During the pendency of these motions, plaintiff Christine A. Palmer settled her claims with defendants and her claims have been dismissed. Docket Nos. 208, 209.

| | |
|---|---|
| Neil R. Pareene | $ 283,783.95 |
| James R. Quinn | $ 68,921.04 |
| William C. Reynheer | $1,115,357.58 |
| John K. Stannard | $ 258,189.40 |
| Allen G. Sweet | $ 128,953.46 |
| David W. Townsend | $ 397,482.91 |
| Carl T. Woodman | $ 432,108.88 |

Docket Nos. 119, 124, 126 & 128. Judgment was entered on the verdicts. Docket No. 133. These motions followed.

### III. Defendants' Motion

Defendants move for an order (1) granting judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or in the alternative (2) granting a new trial pursuant to Fed.R.Civ.P. 59, or (3) granting remittitur on certain of plaintiffs' damage awards.

A motion for judgment as a matter of law under Rule 50 should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the moving] party on that issue." Fed.R.Civ.P. 50(a)(1). The standard under Rule 50 "mirrors" that for a motion for summary judgment under Fed.R.Civ.P. 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion under Rule 50, a court must consider all evidence in the record and not simply the evidence favorable to the nonmovant. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir.2001). "In doing so, however, the court must draw all reasonable inference in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 149, 120 S.Ct. 2097 (citations omitted). Thus, in reviewing the entire record,

a court should consider only that evidence favorable to the nonmoving party and any evidence supporting the moving party which is uncontradicted and unimpeached. *Id.*

The standard for granting a new trial under Rule 59 is less demanding. "[U]nlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998) (internal quotations and citation omitted); *see also Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 224 (N.D.N.Y.1999) (McAvoy, J.). Thus, " 'a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict.' " *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir.2000) (quoting *Landau*, 155 F.3d at 104). A court should grant a new trial if "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Caruolo*, 226 F.3d at 54 (internal quotations and citation omitted).[13]

### A. Timeliness

A motion for judgment as a matter of law and for a new trial following a jury verdict must both be filed within ten days of the entry of judgment. Fed.R.Civ.P. 50(b), 59(b). The original judgment in this case was filed on December 5, 2000. Docket No. 131.[14] Thus, excluding Saturdays, Sundays and legal holidays as required by Fed.R.Civ.P. 6(a), defendants' motion was required to be filed on or before December 19, 2000. On December

---

There thus remain seventeen plaintiffs on these motions.

**13.** As to the legal standard applicable to defendants' motion for remittitur, see section II(C) *infra*.

**14.** An amended judgment was filed on December 11, 2000. Docket No. 133.

19, 2000, defendants filed the instant notice of motion and a supporting affidavit. Docket No. 137. In an order filed the same day, defendants were granted until February 1, 2001 to file and serve supplemental pleadings in support of their motion. Docket No. 136. Defendants timely filed a memorandum of law in support of their motion on February 1, 2001. Docket No. 196. As a threshold matter, plaintiffs now contend that defendants' motion is untimely because their memorandum of law was not filed within the ten days required by the rules. Pls. Mem. of Law (Docket No. 203) at 2–6.

The ten day time limit for this motion is jurisdictional and could not be extended. *See Lichtenberg v. Besicorp Group, Inc.,* 204 F.3d 397, 401 (2d Cir. 2000) (describing time limit as "uncompromisable"); *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 230 (2d Cir. 2000); Fed.R.Civ.P. 6(a). If a motion is not filed within the ten day period, the district court is divested of jurisdiction to consider the motion. *See Weissman,* 214 F.3d at 230. There is no dispute that defendants completed the filing and service of their notice of motion and supporting affidavit within the ten day period. Plaintiffs' contention here thus requires a determination of when a motion is deemed filed for purposes of Rules 50 and 59.

Generally, a motion is deemed filed when it is delivered to the Clerk's Office. *See Wight v. Bankamerica Corp.,* 219 F.3d 79, 85 (2d Cir.2000). Defendants' notice of motion and affidavit were delivered to the Clerk's Office and served within the ten day period. Plaintiffs argue that such filing was not effective for purposes of Rules 50 and 59, however, because the papers filed failed to include a memorandum of law as required by N.D.N.Y.L.R. 7.1(a)(1) and 7.1(g). Plaintiffs also argue that allowing defendants to file their memorandum of law six weeks after their notice of motion was filed circumvents the purpose of the ten day limits in Rules 50 and 59.

Plaintiffs arguments fail for at least two reasons. First, defendants' motion was accepted for filing by the Clerk and the Court on December 19, 2000 and for that reason alone should be deemed filed as of that date. *See Wight,* 219 F.3d at 85 (holding that the district court's treatment of a motion filed under Rule 59 as timely supported the conclusion that the motion timely filed even though supplemental pleadings were filed after the ten day period to cure technical defects in the original pleadings). Second, the requirement in the local rules that a memorandum of law accompany any motion may be excused or delayed if "good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). Here, given the length and complexity of the trial and the fact that a transcript of the trial was not completed until January 9, 2001 (Docket Nos. 143–95), good cause existed for permitting defendants additional time to file and serve their memorandum of law. Thus, the delayed filing of the memorandum of law did not vitiate the timeliness of defendants' motion under the local rules. Moreover, a district court possesses the inherent power to authorize departures from the requirements of its local rules. *See Somlyo v. J. Lu–Rob Enters.,* 932 F.2d 1043, 1048–49 (2d Cir.1991) ("it is the business of the district court to determine whether fairness demands that noncompliance [with local rules] be excused"); *see also Wight,* 219 F.3d at 85–86 (approving the district court's " 'tailor[ing] the Local Rules to best achieve a just outcome.' ") (quoting *Somlyo,* 932 F.2d at 1049).

Accordingly, defendants' motion here was timely filed and plaintiffs' contention to the contrary must be rejected.

## B. Liability

A plaintiff may establish violations of the ADEA and the HRL under theories of disparate treatment and disparate impact. *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,* 964 F.2d 106, 115 (2d Cir.1992); *see also Smith v. Xerox Corp.,* 196 F.3d 358, 363 n. 1 (2d Cir.1999) (holding that claims under the ADEA and the HRL "are analyzed identically"); *Gonzalez v. City of New York,* 135 F.Supp.2d 385, 399, n. 9, 400, n. 11 (E.D.N.Y.2001) (holding that disparate impact age discrimination claim may be asserted under the HRL and analyzed identically to those brought under the ADEA). Disparate treatment requires evidence that an employer intentionally discriminated against a person forty years of age or older while "[d]isparate impact ... results from the use of employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on a protected group and cannot be justified by business necessity." *Maresco,* 964 F.2d at 115 (internal quotation and alteration omitted); *see also District Council 37, AFSCME v. New York City Dep't of Parks & Recreation,* 113 F.3d 347, 351 (2d Cir.1997). Disparate impact age discrimination does not require proof of discriminatory intent. *Smith,* 196 F.3d at 364 (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Rather, the disparate impact theory addresses employment practices "that are fair in form but discriminatory in impact." *Griggs,* 401 U.S. at 431, 91 S.Ct. 849. Although courts of appeals are divided over the viability of the disparate impact theory under the ADEA, this theory of proof remains available in the Second Circuit. *See Smith,* 196 F.3d at 367 n. 6.

To recover under a disparate impact claim, a plaintiff must first establish a prima facie case "by identifying a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." *Smith,* 196 F.3d at 364 (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)); *Knighton v. City of Syracuse Fire Dep't,* 145 F.Supp.2d 217, 224 (N.D.N.Y. 2001) (Scullin, C.J.); *Gonzalez,* 135 F.Supp.2d at 399; *Hogan v. General Elec. Co.,* 109 F.Supp.2d 99, 104 (N.D.N.Y.2000) (Hurd, J.). The burden then shifts to the employer to offer a business necessity for the challenged employment practice. *Smith,* 196 F.3d at 365; *Hogan v. Metromail,* 167 F.Supp.2d 593, 595 (S.D.N.Y. 2001). If an employer offers such a business necessity, the burden then returns to the plaintiff to "show that the employer's proffered reason was merely a pretext for discrimination." *Id.; Knighton,* 145 F.supp.2d at 224. Defendants contend on this motion that plaintiffs failed at each of these steps of their claim and as well failed to establish that the defendants' conduct was willful or that defendants were liable under the HRL.

### 1. Plaintiffs' Prima Facie Case

Defendants contend that plaintiffs' evidence failed to establish a prima facie case as a matter of law because (a) plaintiffs failed to identify a facially neutral employment practice, (b) the statistical evidence was insufficient, and (c) the testimony of plaintiffs' statistical expert witness was improperly admitted and insufficient. Defs. Mem. of Law at 8–16.

First, however, the issue presented here follows a trial on the merits. "It is well-established that once a [discrimination] case has been fully tried on the merits, the question whether the plaintiff has established a prima facie case is no longer relevant." *Ottaviani v. State Univ. of New York,* 875 F.2d 365, 373 (2d Cir.1989)

(citing *Mitchell v. Baldrige,* 759 F.2d 80, 83 (D.C.Cir.1985)) (internal quotations omitted).[15] Thus, "the only issue to be decided at that point is whether the plaintiffs have actually proved discrimination." *Bazemore v. Friday,* 478 U.S. 385, 398, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). Because this case has been fully tried, defendants' motion on this ground is denied since the only cognizable issue at this stage is whether plaintiffs proved discrimination. In the alternative, however, defendants' arguments concerning plaintiffs' prima facie case are considered on their merits.

### a. Facially Neutral Employment Practice

■ Plaintiffs' initial burden under the disparate impact theory required, *inter alia,* that they identify "a specific employment practice which, although facially neutral, has had an adverse impact on" older employees. *Smith,* 196 F.3d at 364; *Gonzalez,* 135 F.Supp.2d at 399. Plaintiffs identified "the implementation of the exempt employee [IRIF] portion of the WAP." Pls. Mem. of Law (Docket No. 203) at 11–13. Defendants contend that this employment practice was insufficiently specific to satisfy plaintiffs' burden.

The requirement that a plaintiff specify the employment practice which he or she alleges caused the discrimination serves to insure that an employer not be held liable for discrimination simply because a result appeared discriminatory numerically. *See Smith,* 196 F.3d at 367–68; *see also Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–58, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Thus, "a plaintiff generally cannot rely on the overall decision-making process

... [as] a specific employment practice." *Smith,* 196 F.3d at 367.

Plaintiffs contend that because the implementation of the guidelines for the IRIF was a component of defendants' WAP, which included other components such as the VSP, employee retraining and transfers, their specification of the "implementation" of the IRIF satisfied its burden of identifying a specific employment practice. Such identification, however, actually specifies the decision-making process by which exempt employees were selected for the termination of their employment. The implementation identified here by plaintiffs retains all the elements of overall decision-making regarding the IRIF, which itself was comprised of various elements. The fact that defendants' implementation of the IRIF was a subpart of the larger WAP does not of itself render it a "specific" employment practice sufficient to satisfy plaintiffs' initial burden.

Nevertheless, a general decision-making process such as that identified by plaintiffs here may serve as the specified employment practice "if the plaintiff can show that the elements of the employer's decision-making process are not capable of separation for analysis." *Smith,* 196 F.3d at 368 (citing 42 U.S.C. § 2000e–2(k)(1)(B)(i)). The trial testimony established that exempt employees were selected for the IRIF pursuant to "Salaried Employee Reduction–in–Force Guidelines." Those guidelines established four criteria by which managers were to select exempt employees for the IRIF. Employees considered for the IRIF were given up to ten points in each for: company service, performance, flexibility and criticality. Points were totaled for each exempt em-

---

**15.** *Ottaviani* was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. However, discrimination cases un-

der Title VII, the ADEA and the HRL are analyzed identically. *See Smith,* 196 F.3d at 362 n. 1.

ployee considered for the IRIF and the exempt employees with the lowest point totals were selected for the IRIF. These guidelines were facially neutral, were followed by all managers in selecting exempt employees for the IRIF, and led directly to the selection of plaintiffs for the IRIF.

The criterion for service was objective on its face, but because it denied credit to employees for any period of employment beyond twenty years, it arguably had a disproportionate impact on employees with lengthy periods of employment with defendants, all of whom were over forty years of age.[16] The remaining three criteria required the application of objective standards in various categories.[17] The points assigned for the four criteria were then totaled to determine which employees would be selected for the IRIF.

Thus, various factors were considered for each criterion and the four criteria were considered as a group to determine selection for the IRIF. The evidence adduced by plaintiffs at trial, principally that of KAPL personnel regarding the guidelines and plaintiffs' statistical expert witness, sufficed to establish that no particular factor and no particular criterion caused the disparate impact on older employees. Rather, the evidence established that, as asserted by plaintiffs, such impact resulted from the implementation of the guidelines and that the various factors and criteria, the elements of defendants' decision-making, reasonably were "not capable of separation for analysis." *Smith*, 196 F.3d at 368. Thus, in the circumstances of this case, plaintiffs' identification of the implementation of the guidelines for select-

ing exempt employees for the IRIF satisfied plaintiffs' initial burden of proof.

### b. Sufficiency of Plaintiffs' Statistical Evidence

Defendants next contend that plaintiffs failed to satisfy their initial burden of demonstrating that any statistical disparity against plaintiffs was caused by age discrimination. Defs. Mem. of Law at 11–14. Plaintiffs respond that the statistical evidence offered through their expert witness sufficed to meet this burden. Pls. Mem. of Law at 13–19.

After a plaintiff specifies the employment practice responsible for the adverse impact on older employees, a plaintiff must then demonstrate, generally through statistical data, that the employment practice caused a significant disparity in outcome between older employees and younger employees. *See Smith*, 196 F.3d at 364–65 (citing *Watson*, 487 U.S. at 994–95, 108 S.Ct. 2777). Where a plaintiff relies on a statistical disparity to meet this burden, that disparity "must be sufficiently substantial to raise an inference of causation." *Id.; see also Watson*, 487 U.S. at 994, 108 S.Ct. 2777 (holding that statistical evidence at this stage must be "of a kind and degree sufficient to" infer discrimination); *Gonzalez*, 135 F.Supp.2d at 399.

No bright line rules have been established to determine the sufficiency of statistical evidence at this stage. *See Ottaviani*, 875 F.2d at 373 ("in accordance with Supreme Court pronouncements, we must reject appellants' suggestion that this court announce a rule of law with respect to what level of statistical significance automatically gives rise to a rebuttable pre-

---

**16.** The most extreme example was presented by plaintiff Clifford B. Meacham. Meacham had been employed by KAPL and General Electric for over forty-three years but received credit under the guidelines for only twenty years of employment.

**17.** For example, advanced degrees, training and prior experience were considered for flexibility and criticality.

sumption of discrimination."); *see also Smith*, 196 F.3d at 365 ("no bright line rules exist"). However, courts generally require a plaintiff to meet two requirements. First, a "plaintiff must identify the correct population for analysis." *Smith*, 196 F.3d at 368. Generally, this population will be those employees who were subject to the employment practice in question. *See id.; Lander v. Montgomery County Bd. of Commissioners*, 159 F.Supp.2d 1044, 1060 (S.D.Ohio 2001); *Shah v. New York State Dep't of Civil Serv.*, No. 94 CIV 9193 RPP, 2001 WL 839986, at *7 n. 7 (S.D.N.Y. July 25, 2001).

Here, plaintiffs identified four possible populations through the testimony of their expert witness, Dr. Janice Fanning Madden. Included in the four groups were all exempt employees at KAPL and those 245 exempt employees who were actually considered for the IRIF. Madden Tr. (Docket No. 154) at 17–18. There was sufficient evidence from which the jury could reasonably find that either group was the correct population for purposes of comparison. As to the population of exempt employees, the implementation of the IRIF commenced with that population within which those employees with excess skills were identified. Moreover, in its own internal analysis of the statistical impact of the IRIF on older employees, KAPL itself chose the population of 2.063 exempt employees for purposes of analysis. *See, e.g.,* Madden Tr. at 34; *see also* Fed.R.Evid. 801(d)(2) (admission by party-opponent). Thus, the record contained sufficient evidence from which the jury could conclude that the correct population for purposes of comparison was KAPL's entire population of exempt employees.

There was also evidence from which the jury could find that the correct population was comprised of the 245 exempt employees whose positions were identified during the excess skills analysis as subject to the IRIF. It was this more limited group who were placed on the matrices and whose numerical scores were compared according to the procedures prescribed in the WAP. Thus, it was this group of exempt employees who were actually and universally subject to all aspects of defendants' implementation of the guidelines for selecting exempt employees for the IRIF—the employment practice identified by plaintiffs in their prima facie case. Accordingly, the record also contained sufficient evidence from which the jury could conclude that the correct population for purposes of comparison was the exempt employees who were placed on the matrices, *i.e.,* those actually considered for the IRIF. *See Smith*, 196 F.3d at 368 ("The [correct] population in a reduction-in-force situation consists of workers subject to termination.").

The second requirement is that a plaintiff demonstrate a statistically sufficient comparison between the predicted result for older employees in the population selected and the actual result. *Ottaviani*, 875 F.2d at 371; *see also Smith*, 196 F.3d at 366 (referring to "expected result" and "obtained result" rather than "predicted result" and "actual result"); *Hogan*, 109 F.Supp.2d at 104. This comparison serves to determine whether there is a statistically significant disparity between the predicted and actual results. For this case a predicted result is determined by the percentage of older employees in the population of employees subject to the IRIF. The actual result constitutes the percentage of older employees actually selected for the IRIF in the population subject to the IRIF. A comparison of the predicted and actual results must be made to determine if a statistically significant disparity exists. *Smith*, 196 F.3d at 365–66; *Ottaviani*, 875 F.2d at 371.

"Statistical significance" measures "the probability that a disparity is simply due to chance rather than any other identifiable factor." *Ottaviani*, 875 F.2d at 371. One measure of statistical significance is standard deviation. *See Smith*, 196 F.3d at 365–66; *Ottaviani*, 875 F.2d at 371. Standard deviation is a "unit of measurement used to express the probability that an [actual] result is merely a random deviation from a predicted result." *Ottaviani*, 875 F.2d at 371. Generally, " '[t]he greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the [predicted] and [actual] results.' " *Id.* (quoting *Coates v. Johnson & Johnson*, 756 F.2d 524, 536 (7th Cir.1985)). If the actual result varies from the predicted result by two standard deviations,[18] "[courts] generally consider this level of significance sufficient to warrant an inference of discrimination." *Smith*, 196 F.3d at 366; *see also Ottaviani*, 875 F.2d at 371–72.

Here, as to the population of 2.063 exempt employees, there were 1,203, or fifty-eight percent, who were older employees. The predicted result from this population for the thirty-one exempt employees whose employment was terminated in the IRIF was thus fifty-eight percent of thirty-one, or eighteen older employees. The actual result was that thirty of the thirty-one employees, or ninety-seven percent, whose employment was terminated in the IRIF were older employees. According to Dr. Madden, there was one chance in 348,000 that this actual result would occur. Madden Tr. at 20. This constitutes between four and five standard deviations.

As to the population of 245 exempt employees placed on the matrices and actually considered for the IRIF, there were 179, or seventy-three percent, who were older employees. The predicted result from this population for the thirty-one exempt employees whose employment was terminated in the IRIF was thus seventy-three percent of thirty-one, or twenty-three older employees. The actual result was thirty, or ninety-seven percent. According to Dr. Madden, there was one chance in 1,260 that this actual result would occur. Madden Tr. at 25–27. This constitutes between three and four standard deviations.[19]

Thus, whether the jury found that the correct population for comparison was the 2,063 exempt employees subject to the IRIF or the 245 exempt employees who were placed on matrices and actually considered for the IRIF, the statistical disparity substantially exceeded two standard deviations, permitting the jury to draw the inference that the disparity was caused by age discrimination. There was, therefore, sufficient evidence from which the jury

---

18. Two standard deviations equates approximately "to a 1 in 20 chance that the outcome is a random fluctuation. Three standard deviations corresponds to approximately a 1 in 384 chance of randomness. Finally, a range of four to five standard deviations corresponds to a probability range of 1 chance in 15, 786 to 1 chance in 1,742,160." *Ottaviani*, 875 F.2d at 372 n. 7 (citing M. Abramowitz & I. Steigan, *Handbook of Mathematical Functions*, National Bureau of Standards, U.S. Government Printing Office, Applied Mathematics Series No. 55 (1966) (Tables 26.1, 26.2)).

19. Dr. Madden testified that she also analyzed the population of 245 employees who were placed on the matrices controlling for the particular matrix on which an employee was placed (*i.e.*, controlling for the particular group of employees against whom an employee was compared). From this analysis, Dr. Madden concluded that there was one chance in seventy-three, or between two and three standard deviations, that an actual result of thirty older employees out of thirty-one selected for the IRIF would occur. Madden Tr. at 23–27.

could find that plaintiffs had satisfied their initial burden as to either group. Based on this evidence alone, defendants' contention that plaintiffs failed to meet their initial burden of demonstrating that the statistical disparity was caused by age discrimination must be rejected.

However, this conclusion is further supported by testimony offered by Dr. Madden during her redirect examination. The statistical evidence described above assessed the evidence to determine the probability that the statistical disparity between the predicted and actual results deviated from the norm by chance or for some other reasons, such as age discrimination. According to Dr. Madden, she also performed multiple regression analyses—"a statistical test which identifies factors, called independent variables, that might influence the outcome of an observed phenomenon, called a dependent variable." *Smith*, 196 F.3d at 363 n. 3. By this method, a statistician seeks to identify legitimate factors, other than age discrimination here, which may have influenced or caused the statistical deviation from the norm. *Id.*

Dr. Madden testified that she performed multiple regression analyses to determine if the statistical disparity could be explained by the individual components of the employees' numerical ratings on the matrices—years of service, performance appraisals, flexibility and criticality. Dr. Madden concluded that there was no significant correlation between an employees' years of service and the likelihood that he or she would be selected for the IRIF. Madden Tr. at 88. As to the other three components, Dr. Madden found that there existed statistically significant age effects in that older employees were more likely than younger employees to have experienced a decline in their performance appraisals after KAPL began planning for the IRIF and generally in the ratings for flexibility and criticality. *Id.* at 88–89. This evidence further supported the jury's finding that plaintiffs' satisfied their burden of proof to establish a prima facie case.

Accordingly, defendants' contention that there was insufficient evidence to establish a prima facie case must be rejected.

### c. Evidence of Multiple Regression Analyses

■ Defendants contend that Dr. Madden's testimony regarding multiple regression analyses was erroneously admitted in evidence. Defs. Mem. of Law at 14–16.

Dr. Madden made no mention of multiple regression analyses in her expert witness reports, her deposition before trial or during her direct examination at trial. On cross-examination at trial, however, Dr. Madden was asked by defendants' counsel at least three times about additional analyses she had conducted. Madden Tr. at 38–39, 56–58, 76–77. In none of his questions did defendants' counsel limit Dr. Madden to analyses conducted prior to her reports or her deposition, and Dr. Madden testified each time that she had in fact conducted such analyses following her deposition and prior to trial. *Id.* In the most detailed colloquy, Dr. Madden was questioned as follows:

Q. You did not do a regression analysis for criticality, did you?

A. Yes.

Q. And did you do one for flexibility?

A. Yes.

. . . . .

Q. And for performance?

A. Yes.

Q. And for company service?

A. Yes.

Madden Tr. at 58. On redirect examination, plaintiffs' counsel asked Dr. Madden

the results of her multiple regression analyses. *Id.* at 83. Defendants' counsel objected that such analyses had not previously been disclosed to defendants. *Id.* The objection was overruled on the ground that the questions of defendants' counsel had "opened the door" and unless plaintiffs' counsel was permitted to ask Dr. Madden about these analyses, the jury could infer that her analyses were unfavorable to plaintiffs. *Id.* at 83–87. Dr. Madden then testified to the results of her multiple regression analyses. *Id.* at 87–89.

A trial court is accorded "substantial deference" in making evidentiary rulings and those rulings are reviewed only for clear abuse of discretion. *Reilly v. Natwest Mkts. Group, Inc.,* 181 F.3d 253, 266 (2d Cir.1999); *see also Healey v. Chelsea Res., Ltd.,* 947 F.2d 611, 619–20 (2d Cir. 1991). "Further, even an erroneous evidentiary ruling will not lead to reversal unless affirmance would be 'inconsistent with substantial justice.'" *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997) (quoting Fed.R.Civ.P. 61).

Here, the ruling on defendants' objection was proper. Defendants' questions to Dr. Madden did not limit her answers to analyses she performed prior to her reports or her deposition. Defendants elicited testimony from Dr. Madden that she had performed multiple regression analyses but left unanswered the results of those analyses. If plaintiffs had not been permitted to elicit those results, the jury could reasonably have inferred that Dr. Madden's analyses were adverse to plaintiffs. Thus, the testimony of Dr. Madden on redirect examination was properly admitted and was not an abuse of discretion. *Cf. Caruolo v. A C & S, Inc.,* No. 93 CIV. 3752(RWS), 1999 WL 147740, at *14 (S.D.N.Y. Mar. 18, 1999) (holding that cross-examination by defendants of plaintiffs' expert witness opened the door to the admission of additional testimony on redirect examination of tests conducted by another expert and reported in a treatise), *aff'd in part and rev'd in part on other grounds,* 226 F.3d 46 (2d Cir.2000).

Moreover, while the testimony of Dr. Madden in this regard supported plaintiffs' claims, that testimony was limited, taking no more than two to three minutes (less than two pages of transcript) in a trial that lasted five weeks during the liability phase alone. Its secondary importance is also underscored by the limited time devoted to it by counsel during their summations. Accordingly, even if the admission of this evidence was erroneous, any such error was harmless. *See* Fed.R.Evid. 61. Defendants' contention here must, therefore, be rejected.

### 2. Defendants' Burden of Production

Plaintiffs having satisfied their burden of establishing a prima facie case, the burden then shifted to defendants to offer a business justification for the challenged employment practice. *See Griggs,* 401 U.S. at 432, 91 S.Ct. 849; *Smith,* 196 F.3d at 365. The jury here found that defendants failed to meet this burden. Special Verdict (Docket No. 86) at 11. Defendants contend that this finding was erroneous as a matter of law. Defs. Mem. of Law at 17–21. Plaintiffs disagree. Pls. Mem. of Law at 19–20.

An employer's burden at this stage is to demonstrate "a legitimate business justification" for the challenged employment practice. *Wards Cove,* 490 U.S. at 643, 109 S.Ct. 2115. The employer's burden is one of production, not persuasion, as the burden of persuasion remains with the plaintiff throughout the case. *See id.; Watson,* 487 U.S. at 1008, 108 S.Ct. 2777; *EEOC v. Joint Apprenticeship Comm.,* 186 F.3d 110, 120 (2d Cir.1999). An employer meets this minimal burden by articulating a business necessity or reason for the em-

ployment practice. *See Watson,* 487 U.S. at 1008, 108 S.Ct. 2777.

The jury found that defendants had not met this burden. Defendants first argue that the jury was asked the "wrong question." Defs. Mem. of Law at 17. The verdict form asked the jury whether any defendant "has articulated a business justification for selecting the plaintiffs for termination of their employment in the reduction-in-force?" Special Verdict at 11. Defendants failed to object to this question prior to its submission to the jury. Charge Conference Tr. (Docket No. 163) at 44–48. Thus, the question must rise to the level of plain error to be cognizable. *See Shah v. Pan Am. World Servs., Inc.,* 148 F.3d 84, 96 (2d Cir.1998) (applying plain error review where party failed to object to proposed special verdict form). Defendants do not claim plain error here and none appears from the record. Second, defendants fail to specify in what respect the question was incorrect and the question appears to reflect accurately defendants' burden at this stage.[20]

The business justification offered by defendants was the budgetary need to reduce its workforce while still retaining employees with skills critical to the performance of KAPL's functions. Defs. Mem. of Law at 18. The presentation of this justification sufficed to satisfy defendants' burden of production. *See Wards Cove,* 490 U.S. at 643, 109 S.Ct. 2115. The consideration of defendants' justification at this stage permitted no qualitative assessment of its sufficiency by, for example, weighing defendants' business justification against other evidence in the case. *See Parcinski v. Outlet Co.,* 673 F.2d 34, 37 (2d Cir.1982) (holding that the wisdom of a business justification may not be questioned). Only if the business justification offered here was weighed against other evidence could the jury have found that defendants failed to meet their burden of production. Thus, as a matter of law, defendants met their burden of production at this stage.

As noted above, the jury found to the contrary.[21] Nevertheless, this erroneous finding does not merit judgment as a matter of law or a new trial. First, although

**20.** Defendants also argue that the jury's finding on this question was somehow inconsistent with its finding on the disparate treatment theory. The two theories required proof of different elements and, therefore, the jury's findings were not internally inconsistent. *See Harris v. Niagara Mohawk Power Corp.,* 252 F.3d 592, 598 (2d Cir.2001) (holding that first question is whether asserted inconsistency can be resolved). Defendants' argument must, therefore, be rejected.

**21.** The jury was instructed as follows on defendants' burden of production:

The second step requires you to determine whether the defendants have rebutted the presumption of discrimination arising under the first step of this theory. Under this step, the defendants must articulate, but not prove, a business justification for selecting the plaintiffs for termination of their employment in the reduction-in-force. This is *not* a burden of proof on the defendants and does not require the defendants

to prove by any standard that the reason offered was the only reason for their decision to terminate the employment of the plaintiffs. Rather, the defendants have satisfied their burden in this step if you find that the defendants have presented a business justification for the selection of the plaintiffs for termination of their employment in the reduction-in-force. You need not find, nor need the defendants prove, that such justification was essential or indispensable to the defendants' business. If you find that the defendants have met this minimal burden, the presumption of discrimination arising under the first step is rebutted and plays no further part in your deliberations.

Jury Charge (Docket No. 85) at 28. The jury was also instructed not to answer the ultimate question regarding discrimination if it found that defendants' had not satisfied their burden of production. Jury Verdict at 11.

not required to do so in light of its finding that defendants failed to meet their burden of production, the jury proceeded to make findings at the third and final stage. The jury's findings at the third and final stage obviated the error made on defendants' burden of production and rendered that error harmless. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Bruneau ex rel. Schofield v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, 759 (2d Cir.1998) (holding that "when we are able to conclude that the verdict was not substantially influenced by the alleged error, then we may be quite confident the objecting party's rights were not prejudiced and may uphold the general verdict"). Second, as noted above, the issue presented here follows a trial on the merits. Thus, issues related to defendants' burden of production are not relevant at this stage and the only question is whether there was sufficient evidence to support the jury's ultimate finding of discrimination. *Ottaviani*, 875 F.2d at 373; *Mitchell*, 759 F.2d at 83.

Therefore, defendants satisfied their burden of production at the second stage as a matter of law. However, the jury's contrary finding in the circumstances of this case does not warrant granting defendants' motion for judgment as a matter of law or for a new trial. Defendants' motion on this ground is denied.

### 3. Discrimination

Defendants also contend that insufficient evidence was offered to support the jury's finding at the final stage that defendants' business justification for implementation of the guidelines for the IRIF was a pretext for age discrimination. Defs. Mem. of Law at 21–22.

"Even if the employer successfully defends the business necessity of the practice, the plaintiff may still prevail if she can show that the employer's proffered explanation was merely a pretext for discrimination." *Smith*, 196 F.3d at 365. One method by which a plaintiff may demonstrate pretext in a disparate impact case is by evidence "that another practice would achieve the same result at comparable cost without causing a disparate impact on the protected group." *Id.* (citing *Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. 2115).

Here, plaintiffs offered evidence from which the jury could find that either of two alternative practices were available to defendants to achieve the same result without causing a disparate impact on older employees. First, defendants could have instituted a temporary hiring freeze to achieve manpower limits. The evidence at trial established that following the VSP, KAPL was only one employee over its manpower ceiling. However, KAPL desired to hire an additional thirty-five new exempt employees. Freeh Tr. (Docket No. 143) at 25–26, 43–44. Second, KAPL could have offered the VSP to a greater number of employees to achieve the desired manpower reduction. The evidence established that a broadened VSP would have attracted sufficient employees to reduce KAPL's manpower to the desired level, its cost would have been no greater than that of the IRIF, KAPL could have rejected the VSP applications of any employees with critical skills, and any adverse impact on older employees would have been avoided. *Id.* at 44–49.

There is little dispute that either alternative offered by plaintiffs would have permitted defendants to achieve desired manpower levels at costs comparable to the cost of IRIF. Defendants argue, however, that plaintiffs failed to adduce evidence that either alternative would have been equally effective as the IRIF in maintaining the mix of essential skills among employees which KAPL required to perform

its functions. There was evidence[22] from which the jury could have found that a limited hiring freeze would not have impaired KAPL's ability to perform its functions given the availability of employees with critical skills within the over 2,000 exempt employees. Moreover, the jury could also find with respect to the broadened VSP alternative that KAPL could have retained employees with skills deemed critical by rejecting the applications of those employees. Thus, there was sufficient evidence before the jury from which it could conclude that the alternatives offered by plaintiffs would have been equally effective as the IRIF. Defendants' motion for judgment as a matter of law and a new trial on this ground is denied.

### 4. Willfulness

The ADEA mandates liquidated damages for a plaintiff, in an amount equivalent to a plaintiff's award for back pay and benefits, if a jury finds that the employer's violation of the ADEA was willful. 29 U.S.C. § 626(b); *see also McGinty v. State of N.Y.*, 193 F.3d 64, 68 (2d Cir.1999). The jury here found that defendants KAPL and Lockheed Martin acted willfully in discriminating against plaintiffs, entitling each prevailing plaintiff to liquidated damages. Special Verdict at 12. Defendants contend that this finding was erroneous as a matter of law. Defs. Mem. of Law at 23–24.

■ An employer acts "willfully" under the ADEA "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (citations and quotations omitted). Thus, either knowledge or reckless disregard is required to establish willfulness. *See McGinty,* 193 F.3d at 68.

■ Defendants contend first that the jury's finding of willfulness was inconsistent with its finding that defendants did not intentionally discriminate against plaintiffs under plaintiffs' disparate treatment theories. However, the questions of "intentional" and "willful" conduct presented different issues for the jury. "Intentional" conduct required evidence that defendants were motivated by plaintiffs' ages to select them for the IRIF. *See Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 203 (2d Cir.1995) "Willful" conduct required evidence that defendants showed reckless disregard for whether their conduct violated the ADEA. Thus, an employer could act willfully by recklessly ignoring the impact an employment practice had on older employees but could act intentionally only if his employment decision was based at least in part on an employee's age. *See Kolstad v. American Dental Ass'n,* 527 U.S. 526, 549, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126–27, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Because the requirements for willful and intentional conduct differ, the jury's different findings on those two questions are not inconsistent and its finding of willfulness on the disparate impact theory was not error as a matter of law for that reason.

■ Defendants also argue that the evidence of defendants' willfulness was in-

---

**22.** Defendants argue that the testimony of KAPL officials that the alternatives offered by plaintiffs would not be equally effective was unrebutted by plaintiffs and, therefore, should be accepted. The testimony of all such witnesses, however, was challenged and impeached by plaintiffs, and the jury was entitled to reject such testimony. After these issues were fully developed at trial and in light of the jury's findings, a court may not substitute its judgment on the credibility of witnesses for that of the jury. *See Reeves,* 120 S.Ct. at 2110 (citations omitted).

sufficient as a matter of law. First, defendants ask the Court to accept the testimony offered by KAPL officials denying willfulness. The credibility of that testimony presented a question of fact for the jury, not the Court. As noted above, the jury was entitled to reject the testimony by KAPL officials and to accept the evidence supporting a finding of willfulness. *See* note 22 *supra*. The evidence adduced at trial which supported a finding of willfulness included the following:

— KAPL officials and employees were aware that the ADEA prohibited employment practices which caused disparate impacts on older employees;

— Defendants were aware that the implementation of the guidelines for the IRIF would result in a disparate impact on older employees, in that thirty of the thirty-one employees selected for the IRIF were older employees, but took no meaningful steps to avoid or mitigate that impact;

— The guidelines for the IRIF dictated that KAPL perform a statistical assessment of the group of employees selected for termination of their employment to identify any disparate impact on older employees. Such an assessment was performed by a KAPL employee which compared the average age of the KAPL workforce of over 2,000 before the IRIF with its average age after the IRIF. In fact, as acknowledged by KAPL at trial and as was self-evident, this statistical assessment was incapable of identifying any disparate impact on older employees. Burek Tr. (Docket No. 146) at 260; Correa Tr. (Docket No. 150) at 26–32. The jury was entitled to conclude from this lone statistical assessment by KAPL prior to the IRIF that KAPL recklessly disregarded what should have been apparent from the fact that thirty of the thirty-one employ-

ees selected for the IRIF were older employees.

— At the same time that KAPL was proceeding to select thirty older employees out of a total of thirty-one for the IRIF, KAPL was proceeding to hire thirty-five new employees, virtually all of whom were younger employees. The jury was entitled to infer from this evidence that KAPL was motivated to disregard the disparate impact of the IRIF on older employees by its desire to hire new and younger employees.

There was, therefore, sufficient evidence for a reasonable jury to find that defendants KAPL and Lockheed Martin acted willfully in disregarding the disparate impact on older employees caused by the IRIF. Defendants' argument to the contrary must be rejected.

### 5. Liability Under the HRL

Defendants contend that they are entitled to judgment as a matter of law on plaintiffs' claim under the HRL. Defs. Mem. of Law at 25–26. The ADEA defines the protected class of older employees as those forty years of age or older. 29 U.S.C. § 631(a). The HRL defines the protected class as those over the age of eighteen. N.Y. Exec. Law § 296(3–a)(a). *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 461 (2d Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). Defendants argue that plaintiffs offered no evidence of any disparate impact from the IRIF on employees over age eighteen.

This contention fails for two reasons. First, defendants raise this argument for the first time on this motion. Defendants did not seek summary judgment on this ground, did not include this ground in their motions in limine and failed to seek judgment as a matter of law on this ground at the close of the plaintiffs' case or at the close of all the evidence. Moreover, defendants failed to request a jury

instruction to this effect, failed to object to the jury instruction linking plaintiffs' claims under the ADEA with those under the HRL,[23] and failed to object to a special verdict form which also linked the claims under the two statutes. Defendants' failure to object at any prior stage waived the objection they now assert. *See Tuttle v. Equifax Check*, 190 F.3d 9, 15–16 (2d Cir. 1999); *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d cir.1993) (holding that vessel owner waived objection to sufficiency of the evidence to support verdict for injured longshoreman by failing to renew its motion for directed verdict at close of all the evidence); *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir.1992) ("Failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection.").

■ Second, defendants' statement of the law appears incorrect. Several courts have noted the differences in the definitions of the protected classes under the ADEA and the HRL. *See, e.g., Gonzalez*, 135 F.Supp.2d at 400 n. 11; *Hogan v. Metromail*, 107 F.Supp.2d 459, 470–71 (S.D.N.Y.2000); *Abdu–Brisson v. Delta Air Lines, Inc.*, No. 94 Civ. 8494(HB), 1999 WL 944505, at *4 n. 4 (S.D.N.Y. Oct. 19, 1999), *aff'd*, 239 F.3d 456 (2d Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). As defendants acknowledge, however, research has revealed no cases addressing this issue. In the absence of any controlling decision to the contrary, guidance must be taken from the Second Circuit's statement in *Smith* that since, as here, "claims under the [HRL] are analyzed *identically* to claims under the ADEA and Title VII, the outcome of an employment discrimination claim made

pursuant to the [HRL] is the same as it is under the ADEA and Title VII." *Smith*, 196 F.3d at 363 n. 1 (emphasis added).

Accordingly, defendants' motion on this ground is denied.

### C. Damages

The jury awarded damages to the seventeen remaining prevailing plaintiffs in varying amounts for back pay, front pay and emotional distress, both past and future. Defendants move for a new trial or remittitur of the damages awarded to all remaining plaintiffs except James R. Quinn. Defs. Mem. of Law at 26–72.

■ If a district court finds that damages awarded by a jury are excessive, it may grant a defendant's motion for a new trial in whole or limited to damages, or it may grant remittitur by conditioning denial of a defendant's motion for a new trial on a plaintiff's accepting damages in a reduced amount. *See Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995); *Tanzini v. Marine Midland Bank*, 978 F.Supp. 70, 77 (N.D.N.Y.1997) (McAvoy, J.). Remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)). "It is not among the powers of the . . . court . . . simply to reduce the damages without offering the prevailing party the option of a new trial." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 914–15 (2d Cir.1997) (quoting *Tingley Sys., Inc.*, 49 F.3d at 96). A reduced award should represent "the maximum award that would not be excessive." *Ragona v. Wal–Mart Stores, Inc.*, 62 F.Supp.2d 665, 668

---

**23.** The jury was instructed to "consider the plaintiffs' claim under the state Human Rights Law ... *identically* to your consider-ation of the plaintiffs' claims ... under the Age Discrimination in Employment Act...." Jury Charge at 14 (emphasis added).

(N.D.N.Y.1999) (McAvoy, J.), *aff'd,* 210 F.3d 355 (2d Cir.2000).

■ Awards of damages for back pay and front pay are authorized under both the ADEA and the HRL, but awards of damages for emotional distress are authorized only by the HRL. *See Haskell v. Kaman Corp.,* 743 F.2d 113, 120–21 (2d Cir.1984)(holding that "plaintiffs are not entitled to recovery for emotional distress in ADEA actions") (citing *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 147–48 (2d Cir.1984)); *Young v. Bank of Boston Conn.,* No. 93 CV 1642(AVC), 1996 WL 756504, at *3 n. 2 (D. Conn. June 18, 1996). The standard for review of damages awarded by a jury under a federal law such as the ADEA is the traditional common law standard whether the award "shocks the conscience." *See Consorti v. Armstrong World Indus., Inc.,* 103 F.3d 2, 4 (2d Cir.1995); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1189 (2d Cir.1992).

■ The standard for review of damages awarded by a jury under a state law such as the HRL is defined by the applicable state law. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 419–20, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Fowler v. Industrial Tire Products, Inc.,* 2001 WL 51007, at *1, 2 Fed. Appx. 125 (2d Cir.2001). The standard under New York law is set forth in N.Y. C.P.L.R. § 5501(c) (McKinney Supp.2001), which directs a court to "determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." The "deviates materially" standard under New York law is less deferential to the jury's verdict than is the "shocks the conscience" standard. *See Gasperini,* 518 U.S. at 424, 116 S.Ct. 2211; *Gasperini v. Center for Humanities, Inc.,* 149 F.3d 137, 139 (2d Cir.1998) (noting on appeal after remand that the New York standard is "more favorable to the party challenging the award than is the federal 'shocks the conscience' review"). Thus, the jury's awards of damages for back pay and front pay under both the ADEA and the HRL and its awards of damages for emotional distress implicate different standards of review on defendants' motion here. In addition, defendants present different arguments under each element of damages.

### 1. Back Pay

■ "A plaintiff who has proven a discharge in violation of the ADEA is, as a general matter, entitled to back pay from the date of discharge until the date of judgment." *Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 167 (2d Cir.1998); *accord, Banks v. Travelers Cos.,* 180 F.3d 358, 364 (2d Cir.1999). With respect to the damages for back pay awarded by the jury, defendants contend that certain plaintiffs failed to mitigate such damages and, therefore, the awards of back pay to those plaintiffs was erroneous as a matter of law.

■ An employee discharged as the result of discrimination "has an obligation to attempt to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'" *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 695 (2d Cir.1998) (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). An employee's duty to mitigate is "not onerous" and does not require that an employee actually find other employment. *Id.; Dailey v. Societe Generale,* 108 F.3d 451, 456 (2d Cir.1997). On this issue, a defendant bears the burden of proving "(1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Hawkins,* 163 F.3d at 695; *Dailey,* 108 F.3d at 456. In considering other employment, a discharged employee "need not go into another line of work, accept a demo-

tion, or take a demeaning position." *Ford Motor Co.*, 458 U.S. at 231, 102 S.Ct. 3057. However, an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir.1998). The "ultimate question" is whether a discharged employee "acted reasonably in attempting to gain other employment or in rejecting proffered employment." *Hawkins*, 163 F.3d at 695 (quoting *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830 (2d Cir.1992)).

### 2. Front Pay

The ADEA authorizes the district court to fashion equitable remedies "to ensure that victims of age discrimination are made whole." *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727 (2d Cir.1984). The ADEA explicitly authorizes a court to require the reinstatement of a discharged employee. *See* 29 U.S.C. § 626(b). However, where reinstatement is not feasible, a district court may award an employee front pay. *Banks*, 180 F.3d at 364. Defendants here concede that reinstatement of all prevailing plaintiffs is impossible and impracticable. Defs. Mem. of Law at 63. Front pay may be awarded for future lost earnings to make "victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125–26 (2d Cir.1996) (quoting *Whittlesey*, 742 F.2d at 729). "While a jury determines back pay, the determination of any front pay award is committed exclusively to the district court's equitable jurisdiction." *Banks*, 180 F.3d at 364; *Tanzini*, 978 F.Supp. at 80. However, a court may receive an advisory verdict from a jury on front pay. *See*

*Hogan v. General Elec. Co.*, 144 F.Supp.2d 138, 144 (N.D.N.Y.2001) (Hurd, J.); *Tanzini*, 978 F.Supp. at 80. Here, the jury returned advisory verdicts on front pay for plaintiffs which the Court adopted when it entered judgment on the jury's verdicts.

Defendants challenge the jury's awards of front pay on the grounds that there was insufficient evidence from which to find that the plaintiffs to whom front pay was awarded lacked reasonable prospects of obtaining comparable employment in the future and it required undue speculation to determine the amount of income such plaintiffs would have earned in the future if their employment had not been terminated. Defs. Mem. of Law at 63. Awards of front pay are necessarily peculiar to the facts of each case and, because such an award requires a degree of prediction, "always involve some degree of speculation...." *Tanzini*, 978 F.Supp. at 81 (quoting *Tyler*, 958 F.2d at 1189). Nevertheless, there must exist sufficient evidence from which the factfinder may reasonably determine the likelihood that a discharged employee will find suitable employment in the future, the amount of income the employee may reasonably be expected to earn in the future, the amount of income the employee reasonably would have earned if his employment with the defendant had not terminated, and the duration of such employment with the defendant. *See Padilla*, 92 F.3d at 124– 26; *Whittlesey*, 742 F.2d at 728; *Tanzini*, 978 F.Supp. at 81.

### 3. Emotional Distress

Defendants contend that the jury's awards of damages for emotional distress under the HRL deviate materially from what would constitute reasonable compensation under New York law. In determining whether a jury's award of such damages was excessive under the

New York standard, the reasonableness of a particular award must be determined by reference to verdicts in similar cases. *See Gasperini*, 518 U.S. at 424, 116 S.Ct. 2211. Damages for emotional distress may not be presumed and are not established simply by evidence of a defendant's discriminatory conduct. *See Tanzini*, 978 F.Supp. at 78. However, such damages may be established by the plaintiff's testimony alone. *See id.*

Where a plaintiff's emotional distress consisted of shock, sleepless nights, nightmares, moodiness, humiliation, upset and the like but the plaintiff did not require treatment,[24] the range of awards sustained by courts in similar cases appears to be from $5,000 to $125,000. *See, e.g., Shannon v. Fireman's Fund Ins. Co.*, 156 F.Supp.2d 279, 296–98 (S.D.N.Y.2001) (reducing award of $80,000 for emotional distress in age discrimination case to $40,000); *Epstein v. Kalvin–Miller Int'l, Inc.*, 139 F.Supp.2d 469, 479–81 (S.D.N.Y. 2001) (upholding jury award of $54,000 for emotional distress for age discrimination and concluding that "some courts have remitted emotional distress awards to between $30,000 and $125,000 where the only evidence of emotional distress has been the plaintiff's testimony that he was distressed, even when no physical manifestations have been claimed"); *Fowler v. New York Transit Auth'y*, No. 96 Civ. 6796(JGK), 2001 WL 83228, at *10–15 (S.D.N.Y. Jan. 31, 2001) (reducing award of $50,000 for emotional distress for racial discrimination to $25,000); *Distefano v.*

*Long Island R.R. Co.*, No. 96 CV 5487, 1999 WL 1704784, at *5–7 (E.D.N.Y. Dec. 21, 1999) (reducing damages for emotional distress in age and gender discrimination case from $7,000,000 to $125,000); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 226–29 (N.D.N.Y.1999) (McAvoy, J.) (reducing awards of $850,000 and $450,000 for emotional distress under the HRL in gender discrimination case to $30,000 each); *Courtney v. City of New York*, 20 F.Supp.2d 655, 660–62 (S.D.N.Y.1998) (finding that maximum award of damages for emotional distress in similar cases is $100,000); *Sanderson v. City of New York*, No. 96–Civ. 3368(LLS), 1998 WL 187834, at *7–10 (S.D.N.Y. Apr. 21, 1998) (finding that awards upheld in similar cases did not exceed $100,000 and reducing jury's award to four plaintiffs in an age discrimination case from $450,000 for each plaintiff to between $10,000 and $100,000); *Tanzini*, 978 F.Supp. at 78–80 (collecting cases and finding applicable range in such cases to be from $5,000 to $30,000); *Allender v. Mercado*, 233 A.D.2d 153, 649 N.Y.S.2d 144 (1st Dep't 1996) (upholding award of $100,000 for mental anguish in an employment discrimination suit); *Boutique Indus., Inc. v. New York State Div. of Human Rights*, 228 A.D.2d 171, 643 N.Y.S.2d 986 (1st Dep't 1996) (reducing award of $150,000 to $100,000 in an age discrimination suit); *see also Shea v. Icelandair*, 925 F.Supp. 1014, 1019–30 (S.D.N.Y.1996) (reducing jury's award for emotional distress in an age discrimination case from $250,000 to $175,000 and finding that "[t]he most important factor that sets this case

---

**24.** Such evidence of emotional distress has frequently been referred to in cases as "garden variety" emotional distress. *See, e.g., Jessamy v. Ehren*, 153 F.Supp.2d 398, 401 (S.D.N.Y.2001); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp.2d 279, 297 (S.D.N.Y. 2001); *Epstein v. Kalvin–Miller Int'l, Inc.*, 139 F.Supp.2d 469, 479 (S.D.N.Y.2001) ("[a] 'garden variety' emotional distress claim is one

that did not require medical treatment"); *Ruhlmann v. Ulster County Dep't of Social Servs.*, 194 F.R.D. 445, 449 & n. 6 (N.D.N.Y. 2000) (Hurd, J.); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 227 (N.D.N.Y.1999) (McAvoy, J.); *Luciano v. Olsten Corp.*, 912 F.Supp. 663, 672 (E.D.N.Y.1996), *aff'd*, 110 F.3d 210 (2d Cir.1997).

apart from others involving emotional pain and suffering is the fact that [defendant's] discriminatory conduct had physical consequences").

What appears from a review of these cases is that courts have exhibited substantial disagreement over what constitutes reasonable compensation for emotional distress under the HRL where the evidence supporting a plaintiff's claim rests exclusively on testimony establishing shock, nightmares, sleeplessness, humiliation, moodiness and similar consequences but without significant physical manifestations or the need for treatment. However, those cases identify factors which affect the determination of the reasonableness of a jury's award, including the nature, severity and duration of such consequences. It further appears that where those consequences do not include physical manifestations or treatment by a medical care provider, the maximum award which does not deviate materially from awards in comparable cases is $125,000.

### 4. Individual Plaintiffs

Defendants' challenges to the damages awarded to the individual plaintiffs require separate consideration of the evidence presented as to each plaintiff.

### a. Raymond E. Adams

Defendants contend that the jury's award of a total of $294,795.60 to plaintiff Raymond E. Adams ("Adams") for emotional distress under the HRL was excessive. Defs. Mem. of Law at 50–52.

Adams was forty-eight at the time of the IRIF. He held the position of Team Coordinator at that time with an annual salary of approximately $49,600. He had been employed by KAPL or its parent company for approximately thirty years. Adams has held two positions with other employers since the IRIF at comparable salaries and is presently employed as a project manager at a manufacturing company. The evidence of Adams' emotional distress consisted of Adams' testimony that he was shocked and devastated by the IRIF, he suffered stress at the loss of his job as he was the sole support for his family, he suffered sleeplessness for months, he was lethargic, he felt small and inadequate, and he has worried constantly since the IRIF about having his employment terminated again. Adams Tr. (Docket No. 180) at 237–89.

The evidence supporting Adams' claim for emotional distress consisted exclusively of shock, sleeplessness, upset and similar consequences but involved no physical manifestations and required no treatment. In these circumstances the maximum award which does not deviate materially from the compensation found reasonable in other similar cases is $125,000. Therefore, defendants' motion for a new trial on the issue of Adams' damages for emotional distress is granted unless Adams files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.

### b. Wallace Arnold

The jury awarded plaintiff Wallace Arnold ("Arnold") back pay in the amount of $172, 899.95 and damages for emotional distress totaling $118,778.41. Defendants contend that Arnold's back pay award should be reduced for his failure to mitigate damages and that the award for emotional distress is excessive. Defs. Mem. of Law at 42–43, 72. Defendants do not challenge the front pay awarded to Arnold.

Arnold was forty-one at the time of the IRIF. Arnold held a doctorate in Environmental Engineering and was employed as a Chemical Waste Engineer at the time of the IRIF earning approximately $44,000 annually. Arnold had been employed by KAPL since 1984, he was married and had

two teenage children. Following the IRIF, Arnold accepted a contract research position at Pennsylvania State University in State College, Pennsylvania which paid approximately $27,000 annually. The contract for that position ended in June 1997 and was not renewed. Arnold and his family then returned to the Albany area where he held positions as a truck driver, bank teller, laundromat worker and gas station attendant and pursued courses to obtain a certificate to teach high school chemistry. Arnold Tr. (Docket Nos. 168, 169).

Defendants argue that while employed at Penn State, Arnold failed to mitigate his damages by seeking comparable employment even though he was aware that the contract for his employment there would end in or about June 1997. However, Arnold testified that he accepted this position in the hope that it would serve as an entry to a teaching position. The jury was entitled to credit this testimony, to find that Arnold's efforts in this period pursuing a teaching position constituted reasonable efforts to obtain comparable employment and to conclude that defendants had failed to meet their burden of proof on this issue. *See Padilla,* 92 F.3d at 125–26. Accordingly, the record sufficiently supported the jury's award of back pay to Arnold, and that award was not substantially erroneous or a miscarriage of justice. Defendants' motion for a new trial on this issue is denied.

The evidence supporting Arnold's claim of emotional distress derived solely from Arnold's testimony. Arnold testified that in the aftermath of the IRIF, he was shocked, devastated and humiliated. He lost twenty to thirty pounds and was unable to sleep for months. Arnold testified that he felt severe shame and humiliation at the loss of his position at KAPL and at the series of jobs he held following the IRIF to support his family, feelings which persisted to the time of trial. Finally, Arnold testified that the IRIF and its aftermath was a significant contributing factor in his wife's decision to separate from him. Arnold Tr. (Docket No. 168) at 1098–1155. Although there was no evidence that Arnold ever required treatment for any consequences of the IRIF, the jury's award was within the maximum award of $125,000 which does not deviate materially from the compensation found reasonable in other similar cases. Accordingly, defendants' motion for a new trial or remittitur on the issue of Arnold's damages for emotional distress is denied.

#### c. Deborah L. Bush

The jury awarded plaintiff Deborah Bush ("Bush") back pay in the amount of $32,152.97, front pay in the amount of $70,625.15, and damages for emotional distress totaling $111,578.41. Defendants contend that they are entitled to a new trial or remittitur on all such awards. Defs. Mem. of Law at 47–49, 65–66.

Bush was forty-one at the time of the IRIF and was the single mother of an eight year old son. She had received a degree in secretarial science and was employed as an administrative specialist at the time of the IRIF earning an annual salary of approximately $35,000. She had been employed by KAPL for twenty-two years. Six months after the IRIF, Bush found a position as a secretary at another company paying approximately $25,000 annually. She accepted a position as a secretary at another company in February 1998 where she remained at the time of trial earning approximately $32,000 annually. Bush Tr. (Docket No. 179).

Defendants challenge the jury's back pay award to Bush on the ground that she failed to satisfy her duty to mitigate damages when she moved to a new position at a lower salary and by failing to continue to

seek employment comparable to her position at KAPL. In February 1998, Bush was earning approximately $27,500 annually when she accepted a position at another company which paid approximately $26,000 annually. Bush testified that she accepted the lower paying position because her opportunities for promotion were greater at the second company. In fact, her annual salary there had risen to almost $32,000 by the time of trial. Bush also testified that she had continued to seek employment comparable to her administrative position at KAPL: by checking advertisements but had found nothing to pursue.[25] Whether Bush's testimony was credible and her efforts to find comparable employment reasonable were questions for the jury. On this record the jury was entitled to find that defendants had not satisfied their burden of proving that Bush failed to mitigate her damages in either respect. That finding was neither substantially erroneous nor a miscarriage of justice. Defendants' motion for a new trial on the issue of the jury's award of back pay to Bush is denied.

Defendants challenge the front pay award to Bush on the grounds that Bush failed to establish the absence of any prospect of obtaining comparable employment and that the duration of the front pay award was unduly speculative. The evidence at trial established that Bush's only post-high school education was for a position as a secretary, the only position she was offered after the IRIF, including from

defendants, was as a secretary, and that Bush had continued to check newspaper advertisements for employment comparable to her position at KAPL but had found none. From this record, there was sufficient evidence to conclude that Bush had no reasonable prospect of obtaining a position comparable to her administrative position at KAPL in the foreseeable future.

Bush was awarded front pay as compensation for a period of ten years. Special Verdict (Docket No. 126) at 1. Given Bush's age and the absence of prospects for comparable employment, it was reasonable to conclude that front pay for a period of ten years was "necessary to provide whole relief for [a] victim[ ] of employment discrimination." *Padilla,* 92 F.3d at 126 (upholding front pay intended to provide compensation over a period of twenty years).[26] This conclusion was neither substantially erroneous nor a miscarriage of justice. Accordingly, defendants' motion for a new trial on the issue of front pay for Bush is denied.

Finally, defendants contend that the jury's award of damages to Bush for emotional distress was excessive and remittitur to $10,000 should be granted. Bush herself presented the only evidence supporting her claim of emotional distress. She testified that following the IRIF, she was upset, ashamed and humiliated. She also experienced headaches, sleeplessness, stomach upset and weight gain. Bush fur-

---

25. Bush testified that in the Summer of 1996, KAPL itself considered her application for re-employment there but only for a secretarial position paying approximately $27,000 annually. Bush Tr. at 18–19.

26. Front pay was awarded to only seven of the eighteen plaintiffs here and the duration of each varied as follows: 1.25 years (Arnold), two years (Reynheer), nine years (Palmatier), 9.75 years (Adams), ten years (Bush), twelve years (Townsend) and 12.5 years (Woodman). Special Verdicts (Docket Nos. 119, 124, 126,

128). Thus, it appears that in rendering its advisory verdicts on front pay, the jury followed its instruction that "[t]he claim for damages of each plaintiff, and the evidence related to that claim, must be considered and weighed by you on its own merits. Whether you award damages to one plaintiff, or the amount of any such damages, has no bearing on any other plaintiff's claim for damages." *See, e.g.,* Jury Charge (Docket No. 127) at 11–12.

ther testified that while these symptoms abated after several months, the headaches and stomach distress continued at reduced frequencies to the time of trial. Bush Tr. at 8–24. Although there was no evidence that Bush ever required treatment for any consequences of the IRIF, the jury's award was within the maximum award of $125,000 which does not deviate materially from the compensation found reasonable in other similar cases. Accordingly, defendants' motion for a new trial or remittitur on the issue of Bush's damages for emotional distress is also denied.

### d. William R. Chabot

Defendants contend that the jury's award of a total of $119,734.85 to plaintiff William R. Chabot ("Chabot") for emotional distress under the HRL was excessive. Defs. Mem. of Law at 40–42.

Chabot was fifty-seven at the time of the IRIF. He was a computer specialist at that time with an annual salary of approximately $50,000. He had been employed by KAPL for thirty-six years. Chabot was unable to find other suitable employment and began collecting his pension from KAPL in February 1996. The evidence of Chabot's emotional distress consisted of the testimony of Chabot and his wife that he was shocked, embarrassed and humiliated by the IRIF, he has suffered sleeplessness since the IRIF, he was ashamed and withdrew from interaction with his sons and others, and he became indecisive and was argumentative with his family. Chabot Tr. (Docket No. 173) at 139–53, 180–81. Although there was no evidence that Chabot ever required treatment for any consequences of the IRIF, the jury's award was within the maximum award of $125,000 which does not deviate materially from the compensation found reasonable in other similar cases. Accordingly, defendants' motion for a new trial or remittitur

on the issue of Chabot's damages for emotional distress is denied.

### e. Allen E. Cromer

Defendants contend that the jury's award of a total of $74,734.85 to plaintiff Allen E. Cromer ("Cromer") for emotional distress under the HRL was excessive. Defs. Mem. of Law at 52–53. Defendants do not challenge the award to Cromer of $17,326.06 for back pay.

Cromer was forty-two at the time of the IRIF. He was a specialist performing inspections at that time earning an annual salary of approximately $43,000. He had been employed by KAPL for fifteen years. Cromer was re-employed by KAPL in September 1996 in a janitorial position and was promoted up to an inspector position in July 1997 at an annual salary of approximately $38,000. Cromer Tr. (Docket No. 173) at 218–24. Cromer subsequently was promoted to another position in the same field, comparable but inferior to his position at the time of the IRIF, at an annual salary of approximately $42,000 which he held at the time of trial. Id. at 225–26.

The evidence of Cromer's emotional distress consisted solely of the testimony of Cromer that he was scared and frightened when he receive notice of the IRIF, he has suffered sleeplessness since receiving that notice, he suffered chest pains due to the stress of the IRIF and received medical care for both the sleeplessness and the chest pains, he withdrew socially, and he was humiliated and embarrassed. Moreover, Cromer testified that during his ten months as a janitor, he was deeply humiliated to be seen by his former co-workers performing what he believed were menial tasks and was occasionally called derisive names by former co-workers. Cromer Tr. at 195–99, 215–31, 249–50. Based on this and other testimony, the jury's award does not deviate materially from the maximum compensation found reasonable in other

similar cases. Accordingly, defendants' motion for a new trial on the issue of Cromer's damages for emotional distress is denied.

### f. Thedrick L. Eighmie

The jury awarded plaintiff Thedrick L. Eighmie ("Eighmie") back pay in the amount of $25,585.00 and damages for emotional distress totaling $40, 275.00. Defendants contend that Eighmie's back pay award should be vacated for his failure to mitigate damages and that the award for emotional distress is excessive. Defs. Mem. of Law at 55–56, 71–72.

Eighmie was fifty-three at the time of the IRIF. Eighmie held a master's degree in Ceramic Engineering and was employed as an engineer at the time of the IRIF earning approximately $54,000 annually. Eighmie had been employed by KAPL since 1979, he was married and had three children, two were in college and one in high school. Following the IRIF, Eighmie found no other employment. He started a financial consulting business, but that business had few clients and Eighmie earned less than $11,000 total in the four years following the IRIF. Eighmie Tr. (Docket No. 187) at 343–73.

Defendants argue that as a matter of law, Eighmie took insufficient steps to satisfy his duty to mitigate damages by finding comparable employment and, therefore, defendants are entitled to judgment at a matter of law or to a new trial on the issue of the jury's award of back pay to Eighmie. However, Eighmie testified that following the IRIF, he prepared a new resume, checked for job listings in local newspapers and at KAPL, and the Department of Labor, attended seminars on interview techniques, provided a copy of his resume to a job placement agency, went on one job interview, contacted a KAPL representative concerning the availability of a position in addition to making efforts to start his financial consulting business. Eighmie Tr. at 355–73. While defendants elicited other evidence of steps Eighmie could have taken to obtain other employment, the questions of the credibility of Eighmie's testimony and the reasonableness of Eighmie's efforts were issues of fact for determination by the jury. Crediting Eighmie's testimony, there was sufficient evidence to support the jury's finding that defendants failed to sustain their burden of proving that Eighmie failed to mitigate his damages. That finding was neither substantially erroneous nor a miscarriage of justice. Defendants' motion on this ground is denied.

The evidence of Eighmie's emotional distress consisted solely of Eighmie's testimony that he was angry and felt betrayed when the IRIF was announced, feelings which had continued to the time of trial. As the sole support for his family and with three college-age children, Eighmie felt like a failure and worried about how he would support his family in the future. Eighmie and his wife were forced by financial constraints to cancel a twenty-fifth wedding anniversary cruise that they had planned with friends. Eighmie suffered sleeplessness following the IRIF which continued to the time of trial. Eighmie Tr. at 343–52, 363. Eighmie never sought treatment for any consequences he experienced from the IRIF. From this testimony, the jury's award does not deviate materially from the maximum compensation of $125,000 found reasonable in other similar cases. Accordingly, defendants' motion for a new trial on the issue of Eighmie's damages for emotional distress or for remittitur is denied.

### g. Paul M. Gundersen

Defendants contend that the jury's award of a total of $130,578.41 to plaintiff Paul M. Gundersen ("Gundersen") for emotional distress under the HRL was

excessive. Defs. Mem. of Law at 60–62. Defendants do not challenge the award to Gundersen of $14,820.15 for back pay.

Gundersen was forty-six at the time of the IRIF. He was a mechanical specialist at that time with an annual salary of approximately $44,000. He had been employed by KAPL or its parent company for twenty-eight years. Gundersen is married and the father of two adult children. Following the IRIF, Gundersen found and maintained other employment at a salary slightly reduced from that at KAPL. Gundersen Tr. (Docket No. 182) at 328–40.

The evidence of Gundersen's emotional distress consisted of the testimony of Gundersen and his wife that he was initially humiliated when he broke down crying at the staff meeting announcing those selected for the IRIF. He has experienced sleeplessness and nightmares continuously since the IRIF, and he has lost interest in many things. Gundersen further testified that he had been diagnosed with depression eight months prior to the IRIF for which he was prescribed an antidepressant. Gundersen testified that his depression was exacerbated by the IRIF, an effect which continued to the time of trial, and that the dosage of his medication was doubled as a result of the IRIF and remained so to the time of trial. Moreover, Gundersen and his wife testified that following the IRIF and as a consequence thereof, Gundersen had gained approximately one hundred pounds by the time of trial. Gundersen Tr. at 328–40, 456–57.

The testimony of Gundersen and his wife established not only the emotional consequences similar in kind to that suffered by other plaintiffs—humiliation, shock, sleeplessness, nightmares, reduced self-esteem and the like—but also physical and mental manifestations of emotional distress. In particular, that testimony established that Gundersen experienced a substantial weight gain and that his preexisting depression was made worse by the IRIF, both of which had persisted in the five years since the IRIF. Thus, the jury's award to Gundersen for emotional distress did not deviate materially from the maximum compensation found reasonable in other similar cases. *See, e.g. Shea*, 925 F.Supp. at 1019–30. Accordingly, defendants' motion for a new trial or remittitur on the issue of the jury's award of damages to Gundersen for emotional distress is denied.

### h. Clifford J. Levendusky

The jury awarded plaintiff Clifford J. Levendusky ("Levendusky") back pay in the amount of $21,461.17 and damages for emotional distress totaling $147,683.21. Defendants contend that Levendusky's back pay award should be vacated for his failure to mitigate damages and that the award for emotional distress is excessive. Defs. Mem. of Law at 46–47, 68–69.

Levendusky was fifty-four at the time of the IRIF. He was employed as an engineering specialist earning approximately $52,000 annually. Levendusky had been employed by KAPL or its parent company for over thirty years, he was married and had two sons, one in college and the other recently graduated from college. On March 4, 1996, Levendusky was rehired by KAPL as a plumber/steamfitter at an hourly rate at which he earned an average of $42,500 annually over the next four years. Levendusky Tr. (Docket No. 173) at 274–98.

Defendants argue that because Levendusky failed to seek other employment either inside or outside KAPL after his return to KAPL, he failed to satisfy his obligation to mitigate damages and, therefore, was not entitled to an award for back pay. However, Levendusky testified that immediately following the IRIF, he had

contacted the KAPL Human Resources Manager about the possibility of being re-hired by KAPL in his former position but was told by the manager that "It's out of the question." Levendusky Tr. at 286–87. Levendusky further testified that after his return to KAPL, he checked the listings of job openings within KAPL but saw no listing for a position comparable to his former position for which he might be qualified. *Id.* at 294–95. The jury was entitled to find from Levendusky's re-employment, the KAPL manager's discouragement of Levendusky's efforts within KAPL and the results of Levendusky's checks of the KAPL internal job listings that defendants had failed to meet their burden of proving that Levendusky failed to mitigate his damages and that Levendusky's efforts in these circumstances were reasonable. This finding was neither substantially erroneous nor a miscarriage of justice. Defendants motion on this ground is denied.

The evidence of Levendusky's emotional distress consisted solely of Levendusky's testimony that he was shocked when told that he had been selected for the IRIF. His shock was exacerbated because at an awards banquet two months before the IRIF at which Levendusky received an award for his years of service, defendant Freeh had shaken his hand and told him not to worry about the IRIF. Levendusky Tr. at 282–83. Levendusky also testified that he was upset and embarrassed to tell his family that he had lost his job, he was forced to accept a demotion to the plumber/steamfitter position to support himself and his family, and his new job was made more difficult because his new co-workers refused to speak to him for the first three years of his return because he was returning to a union position after twenty-three years as a salaried employee. Levendusky Tr. at 274–93. Levendusky never sought treatment for any consequences he experienced from the IRIF. In these circumstances the maximum award which does not deviate materially from the compensation found reasonable in other similar cases is $125,000. Therefore, defendants' motion for a new trial on the issue of Levendusky's damages for emotional distress is granted unless Levendusky files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.

### i. Clifford B. Meacham

Defendants contend that the jury's award of a total of $125,000.00 to plaintiff Clifford B. Meacham ("Meacham") for emotional distress under the HRL was excessive. Defs. Mem. of Law at 37–40.

Meacham was sixty at the time of the IRIF. He received a master's degree in Computer Science and was earning approximately $63,000 annually at the time of the IRIF. He had been employed by KAPL or its parent company for over forty-three years and planned to work until age sixty-five. Following the IRIF, Meacham found employment at another company for approximately one year at an annual salary of approximately $53,000. That employment ended in November 1997 and Meacham then moved to Florida where he has remained, supporting himself at several temporary positions and receiving his pension. Meacham Tr. (Docket No. 164) at 63–112.

The evidence of Meacham's emotional distress consisted of the testimony of Meacham and his treating psychologist that Meacham was initially dazed and bewildered after the IRIF was announced. Meacham lost self-confidence and endured the stress of uncertainty following the loss of his job. He suffered a recurrence of chronic pain in his back, neck and shoulders which he attributed to the stress from

the IRIF. Meacham also suffered symptoms of depression. Meacham sought treatment from a psychologist for problems resulting from the IRIF as well as for other unrelated and preexisting issues. These consequences of the IRIF and Meacham's treatment with the psychologist were generally resolved within one to two years. Meacham Tr. at 65–66, 110–12; Nydegger Tr. (Docket No. 165).

The jury was entitled to credit the testimony of Meacham and his treating psychologist. That testimony established the emotional consequences, physical manifestations of emotional distress and medical care for that distress. On this evidence, the jury's award of $125,000.00 to Meacham for his emotional distress did not deviate materially from the maximum compensation found reasonable in other similar cases. Accordingly, defendants' motion for a new trial on the issue of the jury's award of damages to Meacham for emotional distress or for remittitur is denied.

### j. Bruce E. Palmatier

The jury awarded plaintiff Bruce E. Palmatier ("Palmatier") back pay in the amount of $2,841.28, front pay in the amount of $13,211.05.15, and damages for emotional distress totaling $313,232.48. Defendants contend that they are entitled to a new trial or remittitur on all such awards. Defs. Mem. of Law at 43–45, 69–70.

Palmatier was forty-nine at the time of the IRIF and was married with four children ranging in age from seven to twelve. He was employed as an electrical specialist at the time of the IRIF earning an annual salary of approximately $43,000. Palmatier had been employed by KAPL or its parent company for thirty years. Six months after the IRIF, Palmatier was rehired by KAPL as an electrician at an hourly rate of pay, a position in which he continued through the time of trial. By working substantial overtime, Palmatier earned an approximate annual income of $44,700 in the four years following the IRIF. Palmatier Tr. (Docket No. 186) at 190–228.

Defendants challenge the jury's back pay award to Palmatier on the ground that he failed to satisfy his duty to mitigate damages by failing to seek comparable employment after returning to KAPL as an electrician. Defendants argue that Palmatier's duty to mitigate damages required him to seek an exempt position rather that choosing to remain in the hourly position as Palmatier chose to reduce the likelihood that he would be selected for another IRIF. Palmatier Tr. at 230–32. First, the jury was entitled to find that the income Palmatier earned as an electrician following the IRIF was comparable, if not identical, to that which he had received as an exempt electrical specialist. Second, the reasonableness of Palmatier's decision not to pursue another exempt position for fear of another IRIF was a question for the jury. For either reason, the jury's finding that defendants failed to meet their burden of proving that Palmatier did not sufficiently mitigate his damages was supported by the evidence in the record. That finding was neither substantially erroneous nor a miscarriage of justice. Defendants' motion on this ground is denied.

Defendants challenge the front pay award to Palmatier on the ground that Palmatier failed to establish the absence of any prospect of obtaining comparable employment. The evidence at trial established that Palmatier, a high school graduate with college credits but no college degree, obtained a position as an electrician which was a demotion from his previous position as a specialist but comparable and, with overtime, allowed Palmatier to earn comparable pay. Whether other comparable positions existed and, if so,

whether such prospects were reasonable presented questions of fact. The determination on this record either that Palmatier had already obtained comparable employment or that he had no reasonable prospect of obtaining a position more comparable to his electrical specialist position at KAPL in the foreseeable future was adequately supported by the evidence. That determination was neither substantially erroneous nor a miscarriage of justice. Accordingly, defendants' motion for a new trial or remittitur on the issue of the award of front pay to Palmatier is denied.

Finally, defendants contend that the jury's award of damages to Palmatier for emotional distress was excessive and remittitur to between $5,000 and $30,000 should be granted. Palmatier and his wife presented the only evidence supporting his claim of emotional distress. They testified that following the IRIF, Palmatier began experiencing sleeplessness and anxiety. His personality changed significantly, including increased irritability, lack of "drive," an inability to finish projects and a diminished ability to communicate with his children leading to a deterioration of their family life. Palmatier also experienced a weight gain. Palmatier Tr. (Docket No. 186) at 194–95; Palmatier Tr. (Docket No. 187) at 295–96. These consequences had persisted through the time of trial and showed no signs of abating. *Id.* at 296.

Palmatier further testified that in order to earn income comparable to his income prior to the IRIF, he worked substantial overtime and planned to continue doing so for the foreseeable future. Palmatier Tr. at 222–25. This causes additional stress for Palmatier. As a result, Palmatier consulted his treating physician who in August 2000 prescribed Prozac, an antidepressant. Palmatier was continuing to take Prozac at the time of trial to assist in dealing with the stress. *Id.* at 226–27.

The testimony of Palmatier and his wife adduced evidence from which the jury could conclude that the consequences of the IRIF for Palmatier had included severe stress, personality changes and the treatment which had continued for the five years since the IRIF and would continue into the foreseeable future. Given this testimony establishing the nature, severity and duration of the consequences of the IRIF, the jury could reasonably award Palmatier substantial damages for emotional distress. However, its award of $313,242.38 deviates materially from the maximum compensation of $175,000 found reasonable in other similar cases involving consequences such as the jury could find were present here. *See, e.g., Shea,* 925 F.Supp. at 1019–30. Accordingly, defendants' motion for a new trial on the issue of Palmatier's damages for emotional distress is granted unless Palmatier files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $175,000 on or before March 8, 2002.

### k. Neil R. Pareene

The jury awarded plaintiff Neil R. Pareene ("Pareene") back pay in the amount of $63,050.37 and damages for emotional distress totaling $157,683.21. Defendants contend that they are entitled to a new trial or remittitur on both awards. Defs. Mem. of Law at 49–50, 67–68.

Pareene was forty-five at the time of the IRIF and was married with children. He was employed as a specialist in the position of Craft Production Supervisor at the time of the IRIF earning an annual salary of approximately $48,000. Pareene had been employed by KAPL or its parent company for over twenty-six years. Following the IRIF, Pareene, a high school graduate, enrolled as a student at Schenectady County Community College pursuing

an associate's degree in electrical technology and attended college full-time for the Spring and Fall semesters of 1996. Pareene also obtained a truck driver's license and worked as a truck driver for two different companies from May 1996 to August 1998 at hourly rates ranging from $10.00 to $12.39. Pareene was rehired by KAPL as a janitor in August 1998 at an hourly rate of approximately $17.00. In September 1999, Pareene was promoted to an hourly position as a systems operator at an hourly rate of $20.30. In the four years following the IRIF, Pareene earned an average annual salary of approximately $34,000. Pareene Tr. (Docket No. 174) at 360–408, 487–503.

■ Defendants challenge the jury's back pay award to Pareene on the ground that he failed to satisfy his duty to mitigate damages in two ways. First, defendants argue that Pareene's full-time attendance at college in the year following the IRIF breached his duty to mitigate damages. However, as the Second Circuit has stated:

> [T]here is no per se rule that finds inherently incompatible the duty of a ... plaintiff to use reasonable diligence in securing comparable employment and such a plaintiff's decision to attend school on a full-time basis. Rather, the central question a court must consider when deciding whether a student-claimant has mitigated her damages is "whether an individual's furtherance of his education is inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" We believe that a fact-finder may, under certain circumstances, conclude that "one who chooses to attend school only when diligent efforts to find work prove fruitless" satisfies his or her duty to mitigate.

*Dailey,* 108 F.3d at 456–57 (citations omitted); *see also Smith v. American Serv. Co.,* 796 F.2d 1430, 1432 (11th Cir.1986) (holding that the decision to attend school full-time was "entirely reasonable" where a job search was futile and the claimant held a part-time job while in school). Thus, Pareene's decision to attend school presented a question of reasonableness for determination by the jury in light of the circumstances which he then faced. Those circumstances included efforts by Pareene to seek other employment before enrolling as a full-time student and his obtaining employment while he attended school. Thus, it cannot be said that defendants satisfied their burden of proving Pareene's failure to mitigate in this regard.

Second, defendants argue that in the Spring of 1999, Pareene declined to accept an offer of a promotion to a position more comparable to his position prior to the IRIF. However, Pareene declined the offer because it would require him to work a day shift rather than the preferred night shift to which he was then assigned. The jury was entitled to consider whether the change in shifts made the offered potion unsuitable or not comparable to Pareene's position before the IRIF. Moreover, since this offer was not made until over three years after the IRIF, the jury could at most reduce rather than deny back pay to Pareene on this ground. Thus, the offer to and declination by Pareene of this position presented a question of fact for resolution by the jury. The jury's resolution of this question was not substantially erroneous or a miscarriage of justice. Defendants' motion for a new trial on the issue of the award of back pay to Pareene is denied.

Defendants also contend that the jury's award of damages to Pareene for emotional distress was excessive and remittitur to $10,000 should be granted. Pareene pre-

sented the only evidence supporting his claim of emotional distress. He testified that following the IRIF, he was shocked, angry, confused, frustrated, pained and more prone to crying. Pareene Tr. at 370–72, 502. Being told by defendants that his skills were neither critical nor flexible led him to enroll as a full-time student to improve his skills in those areas. *Id.* at 388–90. He aspired to return to a position at KAPL as satisfying as his position at the time of the IRIF but was told upon his re-employment there that he "could never hope to go back" to his former position. *Id.* at 402. Pareene testified that he has felt a constant strain since the IRIF and that the experience was traumatic. *Id.* at 500. He has felt a constant pressure to avoid mistakes that could lead to another IRIF. *Id.* at 501. The increased overtime he is required to work in his present position also place an additional strain on him. *Id.* at 496.

Pareene's testimony established that he suffered emotional distress in the five years following the IRIF as a consequence of the IRIF. However, that distress did not include significant physical manifestations or require treatment. Thus, the jury's award of $157,683.21 deviates materially from the maximum compensation of $125,000 found reasonable in other similar cases. Accordingly, defendants' motion for a new trial on the issue of Pareene's damages for emotional distress is granted unless Pareene files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.

### l. William C. Reynheer

The jury awarded plaintiff William C. Reynheer ("Reynheer") damages for back pay, front pay and emotional distress totaling $935,617.41. Defendants contend that they are entitled to a new trial on all such awards. Defs. Mem. of Law at 34–37, 63–65.

Reynheer was fifty-six at the time of the IRIF and was married with two adult children. He had received a bachelor's degree in engineering and was employed as an engineer at the time of the IRIF earning an annual salary of approximately $65,400. Reynheer had been employed by KAPL or its parent company for over twenty-six years. Following the IRIF, Reynheer sought unsuccessfully to obtain an engineering position. He then received training to become a truck driver and unsuccessfully sought a position as a truck driver after obtaining a license. In response to a newspaper advertisement, Reynheer then obtained a position as an automobile salesman in September 1996, earning approximately $1,000 monthly. Reynheer was rehired by KAPL as a janitor on November 8, 1996 at an approximate annual income of $30,000. In November 1997, Reynheer was promoted to a position as a technician at an approximate annual income of $35,000. In the four years following the IRIF, Reynheer earned an average annual income of approximately $40,000. Reynheer Tr. (Docket No. 167) at 758–879.

Defendants challenge the jury's back pay award of $179,740.17 to Reynheer on the ground that he failed to satisfy his duty to mitigate damages when he failed to seek other engineering positions after his re-employment by KAPL in November 1996. Reynheer testified at length about his unsuccessful efforts to seek comparable employment prior to his re-employment at KAPL and about his efforts to obtain better positions within KAPL after his return. Whether Reynheer's testimony was credible and his efforts to find comparable employment reasonable were questions for the jury. On this record the jury was entitled to find that defendants had not

satisfied their burden of proving that Reynheer failed to mitigate his damages. That finding was neither substantially erroneous nor a miscarriage of justice. Defendants' motion for a new trial on the issue of the jury's award of back pay to Reynheer is denied.

Defendants challenge the front pay award to Reynheer of $102,380.00 on the grounds that Reynheer failed to establish the absence of any prospect of obtaining comparable employment. The evidence at trial established that Reynheer made diligent efforts for the first year after the IRIF to find employment as an engineer without success and that he made efforts to find employment as an engineer within KAPL after his re-employment there. From Reynheer's diligent but unsuccessful efforts prior to trial, the jury was entitled to find that there were no reasonable prospects for Reynheer to obtain a position as an engineer in the future. Defendants' motion on this ground is denied.

■ Finally, defendants contend that the jury's award of damages of $653,497.24 to Reynheer for emotional distress was excessive and remittitur to between $5,000 and $30,000 should be granted. Reynheer presented the only evidence supporting his claim of emotional distress. He testified that following the IRIF, he felt as he had on the occasions when he learned his parents had died. Reynheer Tr. at 758. Reynheer became depressed and "vegetative." *Id.* at 761. A pre-existing condition of high blood pressure was exacerbated and required an adjustment in his medication. *Id.* at 762. He experienced sleeplessness and his drinking increased. He became irritable and withdrew from family and friends. He ceased exercising as he had before the IRIF. *Id.* at 761–62, 774–75. Reynheer further testified, however, that these consequences largely disappeared by the end of 1996 when he re-

turned to work at KAPL although he has continued to suffer episodes of depression less than once a month related to the IRIF. *Id.* at 763–75. Reynheer never sought treatment for any of these consequences. Reynheer also testified that he felt acute humiliation after returning to KAPL as a janitor and for the year he remained in that position. He would regularly see his former co-workers as he performed his duties, but they avoided contact with him. *Id.* at 841–42.

Reynheer's testimony established that he suffered emotional distress in the five years following the IRIF as a consequence of the IRIF. However, that distress did not include significant physical manifestations or require treatment. In these circumstances, the jury's award of $653,497.24 deviates materially from the maximum compensation of $125,000 found reasonable in other similar cases. Accordingly, defendants' motion for a new trial on the issue of Reynheer's damages for emotional distress is granted unless Reynheer files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.

### m. John K. Stannard

The jury awarded plaintiff John K. Stannard ("Stannard") back pay in the amount of $58,242.97 and damages for emotional distress totaling $140,803.46. Defendants contend that Stannard's back pay award should be vacated for his failure to mitigate damages and that the award for emotional distress is excessive. Defs. Mem. of Law at 57–60, 66–67.

Stannard was forty-seven at the time of the IRIF and was married with one son then in his second year of college. Stannard was employed as a maintenance engineering specialist at the time of the IRIF earning approximately $49,000 annually. Stannard had been employed by KAPL for

over twenty-seven years. On February 2, 1996, Stannard was rehired by KAPL as a janitor at an hourly rate at which he earned an average of $35,300 annually over the next four years. Stannard Tr. (Docket No. 186) at 25–66.

Defendants argue that because Stannard failed to seek other employment either inside or outside KAPL after his return to KAPL, he failed to satisfy his obligation to mitigate damages and, therefore, was not entitled to an award for back pay. However, Stannard, who has an associate's degree, testified that he searched for other comparable employment immediately following the IRIF before applying for and accepting the position at KAPL. Stannard Tr. at 42–43. Stannard further testified that since his return to KAPL, he has continued to check the listings of job openings within KAPL as well as in local newspaper and on the Internet but has seen no listings for a position comparable to his former position for which he might be qualified. *Id.* at 55–57. The jury was entitled to find from Stannard's re-employment and the results of Stannard's search for other positions that defendants had failed to meet their burden of proving that Stannard failed to mitigate his damages and that Stannard's efforts in these circumstances were reasonable. That finding was neither substantially erroneous nor a miscarriage of justice. Defendants motion on this ground is denied.

The evidence of Stannard's emotional distress consisted solely of Stannard's testimony that he felt betrayed, devastated and angry when told that he had been selected for the IRIF. Stannard experienced sleeplessness and weight loss following the IRIF and felt run down. Stannard Tr. at 25–29. The stress of the IRIF also caused high blood pressure, an aggravation of a pre-existing back problem, a sinus infection and dental problems. *Id.* at 29–30. Stannard also experienced trigeminal neuralgia.[27] These problems persisted in diminished degree to the time of trial. *Id.* at 35. The uncertainty caused by the IRIF caused Stannard's son to withdraw from college. *Id.* at 62–66. In these circumstances and given the physical manifestations experienced by Stannard, the maximum award which does not deviate materially from the compensation found reasonable in other similar cases is $175,000. *See Shea,* 925 F.Supp. at 1019–30. Therefore, because the award to Stannard does not exceed that figure, defendants' motion for a new trial or remittitur on the issue of Stannard's damages for emotional distress is denied.

### n. Allen G. Sweet

Defendants contend that the jury's award of a total of $128,953.46 to plaintiff Allen G. Sweet ("Sweet") for emotional distress under the HRL was excessive. Defs. Mem. of Law at 53–55.

Sweet was sixty-three at the time of the IRIF. He was a specialist at that time with an annual salary of approximately $50,000. He had been employed by KAPL or its parent company for over thirty years. Sweet was married and had received a high school equivalency degree. Following the IRIF, Sweet was unable to find other suitable employment and began collecting his pension from KAPL. Sweet Tr. (Docket Nos. 172, 173) at 21–44.

The evidence of Sweet's emotional distress consisted of the testimony of Sweet and his wife that he was shocked, embarrassed and humiliated by the IRIF, he has suffered sleeplessness since the IRIF, he

---

**27.** A disorder of the nervous system causing "excruciating episodic [facial] pain in the area supplied by the trigeminal nerve." Dorland's Illustrated Medical Dictionary 1127 (28th ed.1994).

lost approximately forty pounds, and he was ashamed and withdrew from friends, *Id.* at 27–30, 44, 114–18. The sleeplessness and weight loss continued to the time of trial. *Id.* at 117–18. Sweet never required treatment for any consequences of the IRIF. On this record, the jury's award of $128,953.46 exceeded the maximum award of $125,000 which does not deviate materially from the compensation found reasonable in other similar cases. Accordingly, defendants' motion for a new trial on the issue of Sweet's damages for emotional distress is granted unless Sweet files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.[28]

### o. David W. Townsend

Plaintiff David W. Townsend ("Townsend") was awarded damages for back pay, front pay and emotional distress totaling $379,356.09. Defendants contend that they are entitled to a new trial on all such awards. Defs. Mem. of Law at 56–57, 70–71.

Townsend was forty-six at the time of the IRIF and was married with two school-age children. He had received an associate's degree and was employed as a specialist at the time of the IRIF earning an annual salary of approximately $40,500. Townsend had been employed by KAPL for over twenty-five years. In May 1996, Townsend obtained employment at another company as a laborer at an hourly rate of $14.50 and was later promoted to a position paying an hourly rate of $16.00. In October 1996, Townsend was rehired by KAPL as a janitor and was promoted in February 1998 to a position as irradiation technician where he has since remained at a current current annual income of $43,300. Townsend Tr. (Docket Nos. 1188, 189) at 583–646.

Defendants challenge the jury's back pay award of $18,126.82 on the ground that Townsend failed to satisfy his duty to mitigate damages when he failed to seek other comparable specialist positions after his promotion to the technician position at KAPL in February 1998. Defendants' argument fails for two reasons. First, while not identical in duties or pay to the specialist position, the technician position was sufficiently comparable in duties and pay to satisfy Townsend's duty to mitigate damages. For example, Townsend's annual salary at the time of the IRIF as a specialist was approximately $40,500 while his annual income in the technician position at the time of trial was approximately $43,300. Townsend Tr. at 580, 642. Second, defendants contend that Townsend's failure to mitigate commenced with his promotion to the technician position in February 1998 but do not appear to contend that his efforts for the two prior years were deficient. In these circumstances a question of fact was presented for resolution by the jury as to what extent, if any, the back pay award to Townsend should be reduced for any such limited failure to mitigate. The jury's award here was supported by the evidence in the case. The award was not substantially erroneous or a miscarriage of justice. Accordingly, defendants' motion for a new trial on the issue of the jury's award of back pay to Townsend is denied.

Defendants challenge the front pay award to Townsend of $25,121.50 on the

---

**28.** The jury's award deviates from what has been found herein to be the maximum reasonable compensation in other cases by less than $4,000, or approximately three percent. Little guidance is found as to whether such a deviation is "material" under the HRL. However, since the figure of $125,000 has been determined to be the *maximum* reasonable compensation in such circumstances, the deviation here is deemed material.

ground that Townsend failed to establish the absence of any reasonable prospect of obtaining comparable employment. The evidence at trial established that Townsend made diligent efforts for two years after the IRIF to find employment comparable to the specialist position he held at the time of the IRIF without success and that the technician position he ultimately obtained at KAPL was sufficiently comparable, if not identical, to the specialist position to satisfy Townsend's burden of demonstrating the absence of reasonable prospects of obtaining more comparable employment. Townsend's education, age and unsuccessful efforts to obtain more comparable employment for over two years prior to February 1998 could also be considered. On this record, therefore, defendants' motion for a new trial on the issue of the award of front pay to Townsend must be denied.

 Finally, defendants contend that the jury's award of damages of $336,107.77 to Townsend for emotional distress was excessive and remittitur to between $5,000 and $30,000 should be granted. Townsend presented the only evidence supporting his claim of emotional distress. He testified that following the IRIF, he was shocked, depressed, irritable and "not able to function properly." Townsend Tr. at 584–89. Townsend stated that he suffered sleeplessness which has continued since the IRIF. *Id.* at 590. Townsend further testified that he began suffering acidic stomach pains following the IRIF which have continued to date and for which his doctor prescribed medication. *Id.* at 591–92. Townsend also testified that he experienced episodes of chest pains from the stress of the IRIF which caused him to seek treatment. *Id.* at 592–93. The manual labor position Townsend found immediately after the IRIF caused a hernia which required surgery. *Id.* at 618.

Townsend's testimony established that he suffered emotional distress in the five years following the IRIF as a consequence of the IRIF which will continue in the future. It also established that this included significant physical consequences requiring treatment. In these circumstances the maximum award which does not deviate materially from the compensation found reasonable in other similar cases is $175,000. *See, e.g. Shea,* 925 F.Supp. at 1019–30. Therefore, defendants' motion for a new trial on the issue of Townsend's damages for emotional distress is granted unless Townsend files and serves a written acceptance of remittitur of the emotional distress component of his damages award to $175,000 on or before March 8, 2002.

### p. Carl T. Woodman

Plaintiff Carl T. Woodman ("Woodman") was awarded damages for back pay, front pay and emotional distress totaling $398,188.70. Defendants contend that they are entitled to a new trial on all such awards. Defs. Mem. of Law at 45–46, 69.

Woodman was forty-five at the time of the IRIF and was married. He had received an associate's degree in business administration and was employed as a specialist in nondestructive testing at the time of the IRIF earning an annual salary of approximately $47,000. Woodman had been employed by KAPL or its parent company for over twenty-five years. In September 1996, Woodman was rehired by KAPL as a janitor at an hourly rate of $16.00. Woodman left that position for one as a field inspector at another company at an hourly rate of $17.00. Woodman's employment there was terminated in the Summer of 1998. He was then rehired by KAPL in November 1998 as a nondestructive tester, where he remains, at an hourly rate from which he received an approximate annual income of $49,000.

Woodman Tr. (Docket Nos. 179, 180) at 60–141.

Defendants challenge the jury's back pay award of $33,920.18 to Woodman on the ground that he failed to satisfy his duty to mitigate damages by failing to seek other comparable specialist positions after his re-employment at KAPL in 1998. Defendants' argument fails for three reasons. First, while not identical in duties or pay to the specialist position Woodman held at the time of the IRIF, the jury could reasonably have found that the position as a tester was sufficiently comparable in duties and pay to satisfy Woodman's duty to mitigate damages. For example, Townsend's annual salary at the time of the IRIF as a specialist was approximately $47,000 while his annual income in the position as a tester at the time of trial was approximately $49,000. Woodman Tr. at 55, 140. Second, Woodman testified that he in fact made efforts to find other employment after November 1998. *Id.* at 136–39. The jury could conclude from such testimony that Woodman in fact satisfied his duty to mitigate damages. Third, defendants contend that Woodman's failure to mitigate commenced with his re-employment at KAPL in November 1998 but do not appear to contend that his efforts for the nearly three prior years were deficient. In these circumstances a question of fact was presented for resolution by the jury as to what extent, if any, the back pay award to Woodman should be reduced for any such limited failure to mitigate. The jury's award here is supported by the evidence in the case. That award was neither substantially erroneous nor a miscarriage of justice. Accordingly, defendants' motion for a new trial on the issue of the jury's award of back pay to Woodman is denied.

Defendants challenge the front pay award to Woodman of $42,344.21 on the ground that Woodman failed to establish the absence of any reasonable prospect of obtaining comparable employment. The evidence at trial established that Woodman made diligent efforts for the five years after the IRIF to find employment comparable to the specialist position he held at the time of the IRIF without success and that the position of tester he ultimately obtained at KAPL was sufficiently comparable, if not identical, to the specialist position to satisfy Woodman's burden of demonstrating the absence of reasonable prospects of obtaining more comparable employment. Woodman's education and age could also be considered in determining whether there existed any reasonable prospect that he would obtain more comparable employment in the future. On this record, therefore, defendants' motion for a new trial on the issue of the award of front pay to Woodman must be denied.

Finally, defendants contend that the jury's award of damages of $321,924.31 to Woodman for emotional distress was excessive and remittitur to between $5,000 and $30,000 should be granted. Woodman presented the only evidence supporting his claim of emotional distress. He testified that following the IRIF, he felt scared, ashamed and betrayed. Woodman Tr. at 60–64. Woodman stated that he suffered sleeplessness and that he has remained scared, irritable, anxious about the future and paranoid since the IRIF. *Id.* at 140–41. Woodman sought no treatment for any of these consequences of the IRIF. In these circumstances the maximum award which does not deviate materially from the compensation found reasonable in other similar cases is $125,000. Therefore, defendants' motion for a new trial on the issue of Woodman's damages for emotional distress is granted unless Woodman files and serves a written acceptance of remitti-

tur of the emotional distress component of his damages award to $125,000 on or before March 8, 2002.

## IV. Plaintiffs' Motions

Plaintiffs seek awards of prejudgment interest, postjudgment interest, an upward adjustment of the judgment in light of plaintiffs' increased tax liabilities, and attorneys' fees and costs.

### A. Prejudgment Interest

Plaintiffs seek an award of prejudgment interest for the damages awarded for back pay and for past emotional distress for the period from the effective date of the IRIF, January 12, 1996, through the date of the judgment on the jury's verdicts, December 5, 2000. Pls. Mem. of Law (Docket No. 141) at 4–6. Defendants do not oppose an award of prejudgment interest for back pay or the methodology proposed by plaintiffs for calculating prejudgment interest, but defendants oppose any award of prejudgment interest for the awards for past emotional distress. Defs. Mem. of Law (Docket No. 201) at 2–4. Therefore, without objection, plaintiffs' motion for an award of prejudgment interest on the back pay awards is granted for the period from January 12, 1996 through December 5, 2000, and such interest shall be calculated by (1) dividing the back pay awards evenly over the period from January 12, 1996 through December 5, 2000; (2) the average annual United States Treasury bill rate of interest referenced in 28 U.S.C. § 1961 shall then be applied to each component period; and (3) the interest shall be compounded annually. *See Hogan,* 144 F.Supp.2d at 141; *Stratton v. Department for the Aging for the City of N.Y.,* No. 91 Civ. 6623(SAS), 1996 WL 352909, at *4 (S.D.N.Y. June 25, 1996).

■■■ Defendants oppose plaintiffs' motion for an award of prejudgment interest for the awards of damages for past emo-

tional distress. Plaintiffs contend that such an award should be made to insure that plaintiffs are made whole. *See Robinson v. Instructional Sys., Inc.,* 80 F.Supp.2d 203, 207 (S.D.N.Y.2000) ("courts also exercise their discretion to award prejudgment interest on compensatory damage awards when interests of fairness and full compensation to the plaintiff so require"). However, for two reasons, plaintiffs' motion for prejudgment interest on the awards for past emotional distress is denied.

■■■ First, prejudgment interest is generally awarded "to compensate the plaintiff for loss of the use of money wrongfully withheld through an unlawful discharge." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 281 (2d Cir.1987). Unlike the awards for back pay, the awards here for past emotional distress did not compensate plaintiffs for any money withheld as the result of the IRIF but for emotional injuries suffered as a result thereof. Thus, prejudgment interest on those awards is not required to insure that plaintiffs are made whole in that regard.

Second, the awards for past emotional distress were made under the HRL. New York courts generally hold that prejudgment interest is unavailable for awards for past emotional distress. *See Campbell v. Metropolitan Property & Cas. Ins. Co.,* 239 F.3d 179, 186–87 (2d Cir.2001); *Miller v. Santoro,* 227 A.D.2d 534, 535, 643 N.Y.S.2d 168 (2d Dep't 1996) (correcting judgment which erroneously awarded preverdict interest for conscious pain and suffering); *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.,* 176 Misc.2d 325, 333, 672 N.Y.S.2d 230 (1997) ("courts of New York State have consistently held that pre-verdict interest is *not* available on an award of compensatory damages") (em-

phasis in original); *see also* N.Y. C.P.L.R. § 5001(a) (McKinney Supp.2001).

Therefore, both because considerations of fairness do not support an award of prejudgment interest for past emotional distress here and because plaintiffs' awards for past emotional distress were made under the New York HRL and New York law does not authorize prejudgment interest for such awards, plaintiffs' motion for prejudgment interest on their awards for past emotional distress is denied.

## B. Postjudgment Interest

Plaintiffs seek an award of post-judgment interest pursuant to 28 U.S.C. § 1961 on all amounts awarded from December 5, 2000, the date the amended judgment was filed, until the judgment is satisfied. Pls. Mem. of Law at 6–7. Defendants do not oppose this motion. Accordingly, plaintiffs' motion is granted and plaintiffs are granted postjudgment interest on all amounts awarded from December 5, 2000 to the date the judgment is satisfied.

## C. Upward Adjustment for Increased Taxes

█ Plaintiffs also seek an upward adjustment of their awards to offset what they contend are adverse tax consequences from the lump sum awards. Pls. Mem. of Law at 7–8. Plaintiffs rely on the only case which research reveals has awarded such an adjustment. *See O'Neill v. Sears, Roebuck & Co.*, 108 F.Supp.2d 443, 446–48

(E.D.Pa.2000). However, plaintiffs offered no evidence on any claimed adverse tax consequences at trial. Moreover, the evidence offered in support of this motion fails to demonstrate any such adverse consequence. Plaintiffs offer only a proposed methodology for calculating such tax consequences[29] and a conclusory "demonstration" of that methodology as to plaintiff Reynheer which would result in an upward adjustment of Reynheer's award by approximately sixty-five to eighty-five percent.[30] No basis for this conclusion is provided and, therefore, plaintiffs' "demonstration" is unduly speculative. Finally, the *O'Neill* case provides the only authority for such an upward adjustment, but that case acknowledged that it stood alone, it has yet to be followed by any other court and it limited its upward adjustment to an award for back pay and front pay but not damages for emotional distress, a limitation plaintiffs ignore here. In these circumstances plaintiffs' motion for an upward adjustment must be denied.

## D. Attorneys' Fees and Costs

Plaintiffs seek attorneys' fees and costs totaling $1,037,818.08 for those fees and costs incurred through November 22, 2000[31] when the jury returned its last verdict. Docket No. 197. Such fees and costs are sought under the ADEA against defendants KAPL and Lockheed Martin. The ADEA mandates an award of reasonable attorneys' fees and costs to a prevail-

---

**29.** *See* Barry Ben–Zion, *Neutralizing the Adverse Tax Consequences of a Lump–Sum Award in Employment Cases*, 13 J. of Forensic Econ. 233 (2000).

**30.** According to plaintiffs' counsel, Reynheer's award of $1,115,357.58 should be adjusted upward by $948,054. Pls. Mem. of Law at 8. According to plaintiffs' economist, that award should be adjusted upward by $718,341. Riccardi Aff. (Docket No. 140) at ¶ 10.

**31.** Plaintiffs' motion concerns fees and costs incurred to the date of the last verdict. Plaintiffs' counsel have incurred additional fees and costs since that date, *inter alia*, in responding to defendants' posttrial motions. Accordingly, plaintiffs are granted leave to file a supplemental motion for attorneys' fees and costs incurred subsequent to November 22, 2000.

ing plaintiff to the extent authorized by the Fair Labor Standards Act, 29 U.S.C. § 216(b). *See* 29 U.S.C. § 626(b); *Lightfoot*, 110 F.3d at 913. "The operative term is 'reasonable.'" *Tanzini*, 978 F.Supp. at 82.

### 1. Attorneys' Fees

Plaintiffs seek a total of $979,348.71 in attorneys' fees. To determine the reasonable amount of attorneys' fees, a court must first multiply the number of hours expended by a plaintiff's attorney in prosecuting a case by the reasonable hourly rate charged by the attorney to establish a "lodestar" figure. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Certain adjustments may then be made to this lodestar figure to arrive at a final award. *Tanzini*, 978 F.Supp. at 83–84. Here, plaintiffs seek an award for fees charged by three attorneys, a law clerk who was admitted to practice as an attorney during the pendency of this case, and three paralegals.

### a. Hours Expended

Plaintiffs contend that their attorneys and staff expended a total of 6,935 hours in prosecuting this case. DuCharme Aff. (Docket No. 197) at Exs. A–E. Defendants challenge the hours claimed in several respects.

Plaintiffs assert that the hours claimed do not include any hours expended in prosecuting the claims of (a) the two plaintiffs for whom the jury returned a verdict in favor of defendants, or (b) the eight plaintiffs who settled their claims following the liability phase of the trial.[32] *Id.* at ¶¶ 6–8. Defendants generally accept the method by which plaintiffs excluded hours expended on the claims of these ten plaintiffs.

Defs. Mem. of Law (Docket No. 201) at 15–16. However, defendants contend that there should be further exclusions where plaintiffs' records indicate that the attorneys' time was devoted exclusively to one or more of the ten defendants and where plaintiffs' exclusion of time did not sufficiently reflect the portion of that time devoted to on or more of the ten plaintiffs. *Id.* at 16–17 & nn. 7, 8. The total fees claimed for such entries in plaintiffs' records is $4,175.52. A review of plaintiffs' records confirms defendants' contention in whole regarding those instances where the entire billing entry was devoted to one or more of the ten plaintiffs. *See* Defs. Mem. of Law at 16 n. 7. However, where a billing entry was devoted in one-half to one of the ten plaintiffs, a review of the records indicates that defendants are incorrect as to one such entry and that the reduction sought was miscalculated as to the others. *See id.* at 17 n. 8. Therefore, the lodestar figure will be reduced on this account by a total of $3,412.52.

Defendants challenge several categories of the hours claimed on the ground that such hours were redundant and unnecessary. Defs. Mem. of Law at 17–19; *see Hensley*, 461 U.S. at 432, 103 S.Ct. 1933; *Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 97 (2d Cir.1997). First, defendants contend that three meetings with plaintiffs attended by all three of plaintiffs' attorneys and for which all three attorneys billed their full hourly rate was unnecessary. Defs. Mem of Law at 17–18. However, while it may generally hold that one attorney will suffice to provide services in most instances, there may arise certain situations at critical junctures of cases which require the attendance and participation of two or more attorneys. In these

---

**32.** A ninth plaintiff, Christine A. Palmer, settled her claims after plaintiffs filed this motion. *See* note 12 *supra*. The extent to which, if at all, the hours expended by plaintiffs'

counsel should be adjusted because of that settlement is unclear. Accordingly, this motion is considered without adjustment for the Palmer settlement.

three instances, the three attorneys attended meetings at the outset of the case with various plaintiffs to obtain information and assess the potential of the case. Given the number of plaintiffs, the complexity of the case and the impact of a commitment to accept this case to a law firm like that of plaintiffs' counsel with only three attorneys, these early meetings were sufficiently important that the attendance of all three attorneys was not unreasonable. Accordingly, the hours claimed by all three attorneys for these meetings will be allowed.

Defendants also contend that in twelve instances, two or more of plaintiffs' attorneys billed for attendance at certain depositions. Defs. Mem. of Law at 18 (specifying the instances). A review of those twelve instances indicates that six of those instances actually involved meetings among plaintiffs' attorneys and the other six involved the depositions of key KAPL officers and employees. Meetings among counsel to review and discuss developments in the case were essential and, therefore, reasonable. Defendants have not suggested, nor does it appear from the billing records of plaintiffs' counsel, that such meetings were held with excessive frequency. As to the depositions, the attendance of two attorneys at a single deposition is not unreasonable as a matter of law. *See Hogan,* 144 F.Supp.2d at 141 (holding in age discrimination case where two attorneys attended depositions on behalf of four plaintiffs that "[i]n light of the complexity of this case and the fact that [the prevailing plaintiff] was suing ... a large company with significant resources at its disposal, the use of two attorneys was not unnecessary or unreasonable"); *Coffey v. Dobbs Int'l Servs., Inc.,* 5 F.Supp.2d 79, 86 (N.D.N.Y.1998), *rev'd on other grounds,* 170 F.3d 323 (2d Cir.1999). The attendance of two attorneys for plaintiffs at depositions appears to have been limited to such important witnesses as only one attorney generally attended depositions for plaintiffs. In the circumstances of this case, it was not unreasonable for two attorneys to attend those particular depositions. Accordingly, the hours claimed by plaintiffs' counsel will not be reduced in these instances.

Defendants also contend that the hours claimed should be reduced by the hours claimed for consultation with an expert witness who was never retained or called to testify by plaintiffs. Defs. Mem. of Law at 19 & n. 9. However, it was not unreasonable for plaintiffs to explore the possibility of calling other expert witnesses as case preparations proceeded and the time expended in this regard was not excessive. Defendants further contend that time expended in drafting a letter to the DOE after the liability phase and before the damages phase and time expended in that period for legal research on liability after liability had been found by the jury were unnecessary. *Id.* at 19. However, settlement discussions between the parties were ongoing in this period, the records of the DOE being sought in the letter were potentially relevant to both settlement and the damages phase of the trial, and the legal research on liability was likewise useful to plaintiffs in their settlement discussions both as to damages awarded in disparate impact cases and to refute defendants' continuing assertions that the evidence did not support the verdict on liability. Thus, the hours claimed in these instances were not unreasonable and will not be reduced.

Finally defendants point out what appears to be a billing error in the duplicate entries for March 26 and 27, 1998. Defs. Mem. of Law at 19. The entries are identical in all respects and only one such charge is reasonable. Accordingly, the lodestar will be reduced by a total of

$218.59 for the duplication of charges in this instance.

### b. Hourly Rates

■ With one exception, the hourly rates claimed by plaintiffs' counsel are within the range of those previously found reasonable in this district, defendants take no issue with those rates and the rates claimed are allowed. The exception concerns Kimberly Ann Harp. Harp began work on this case for plaintiffs' counsel in 1997 when she was a second-year law student. DuCharme Aff. at ¶ 36. She continued to provide legal services throughout this case, including after her graduation from law school and admission to the bar in 1999. Plaintiffs claim hourly rates of $90–$100 throughout the case for work performed by Harp. Defendants do not challenge that rate for work performed after Harp was admitted to the bar but contend that the rate is excessive for work performed prior to that time. Defs. Mem. of Law at 14–15. Defendants contend that Harp's hourly rate should be no more that $65 prior to her admission to the bar. *See John S. v. Cuomo*, No. 90–CV–294 (NPM), 1999 WL 592693, at *2 (N.D.N.Y. July 29, 1999) (McCurn, J.) (awarding hourly rate of $65 for law student work). Defendants' contention finds support in the cases decided in this district. *See, e.g., id.; Hannigan v. Board of. Educ. of Brunswick Sch. Dist.,* No. 95–CV–1435 (FJS), 1997 WL 10971, at *3 (N.D.N.Y. Jan. 9, 1997) (Scullin, J.) (awarding hourly rate of $50 for law student work). Recalculating the amounts claimed by plaintiffs at the lower hourly rate for Harp requires that the lodestar fugure claimed by plaintiffs be reduced by a total of $4,753.05.

Reducing the lodestar figure of $979,348.71 claimed by plaintiffs by the three amounts described above yields a total lodestar figure of $970,964.55.

### c. ˮAdjustments

■ There exists "a 'strong presumption' that the lodestar represents the 'reasonable' fee." *City of Burlington v. Dague,* 505 U.S. 557, 561, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)). Adjustments may be made to the lodestar figure for various reasons, but the party seeking such an adjustment bears the burden of establishing its reasonableness. *See id.* (citing *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

Plaintiffs contend that the lodestar figure should be adjusted upward in an unspecified amount given various factors present in this case, including the novelty and difficulty of the issues, the skill required to represent the plaintiffs successfully and the result obtained. Pls. Mem. of Law at 5 (citing *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933). There is no question that plaintiffs' counsel demonstrated uncommon skill in prosecuting this case on behalf of twenty-eight plaintiffs against defendants with substantial resources and themselves represented by skilled counsel. The result obtained for the plaintiffs was also unqualifiedly successful. However, the lodestar figure reasonably reflects not only the time, effort, resources and skill required of plaintiffs' counsel in this case but bears a reasonably proportionate relationship to the result obtained. Accordingly, plaintiffs have failed to meet their burden of demonstrating that the lodestar figure should be adjusted upward.

Defendants contend that the lodestar figure should be adjusted downward by fifty percent in light of plaintiffs' limited success in prevailing on the disparate impact theory but not on the disparate treatment theory. Defs. Mem. of Law at 19–24. As noted above, the lodestar figure

includes downward adjustments for the jury's verdict in favor of defendants as to two plaintiffs and the settlement of the claims of eight other plaintiffs. Defendants, therefore, seek the downward adjustment here solely on the ground of the jury's rejection of the disparate treatment theory.

■ The lodestar figure may be adjusted downward where a plaintiff prevailed on certain claims but not on others. However, no reduction on this ground should be made "if the successful and unsuccessful claims are 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories.'" *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1183 (2d Cir.1996) (quoting *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1259 (2d Cir.1987)); *Hogan*, 144 F.Supp.2d at 141; *Tanzini*, 978 F.Supp. at 83. Thus, "[s]o long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir.1994) (quoting *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir.1992)).

The determination whether successful and unsuccessful claims bear a sufficiently close relationship that no downward adjustment for limited success should be made is necessarily informed by the facts of each case. However, courts have held in other cases that, for example, claims of age discrimination and retaliatory discharge were inextricably intertwined, *see Dominic*, 822 F.2d at 1259; claims of sexual harassment, sex discrimination, retaliation and age discrimination were inextricably intertwined, *Greenbaum v. Svenska Handelsbanken, N.Y.*, 998 F.Supp. 301, 306 (S.D.N.Y.1998); and claims of a failure to promote and wrongful termination, both based on age and disability discrimination,

were inextricably intertwined. *Tanzini*, 978 F.Supp. at 84.

■ Here, plaintiffs' claims of age discrimination were asserted on the alternative theories of disparate treatment and disparate impact. The two theories are closely related. Moreover, the preparation and trial on the two theories involved the discovery and testimony of virtually all the same witnesses regarding how the individual plaintiffs were treated in the IRIF and whether there existed reasonable alternatives to the IRIF. Moreover, plaintiffs' claim that defendants acted willfully involved virtually identical evidence under either theory. Given the inherently close relation of the two theories, the fact that the evidence concerning the two theories substantially overlapped in this case and the "common core of facts" underlying the two theories, it cannot be said that the two theories were wholly unrelated.

Nevertheless, to a minimal degree the preparation and trial of the two theories required plaintiffs' counsel to devote time to the unsuccessful disparate treatment theory. A reduction of ten percent to account for such time appears appropriate. *See Greenbaum*, 998 F.Supp. at 307 (reducing fee by ten percent where successful and unsuccessful claims inextricably intertwined); *Dailey*, 915 F.Supp. at 1331 (reducing lodestar figure by ten percent). Thus, the lodestar figure will be reduced on this ground by $97,096.46.

For the reasons set forth above, plaintiffs are awarded attorneys' fees in the total amount of $873,868.09.

## 2. Costs

■ Plaintiffs also move for an order awarding them costs totaling $58,469.37 incurred in the litigation of this case. Pls. Mem. of Law at 6. As prevailing parties, plaintiffs are entitled to recover taxable costs pursuant to 28 U.S.C. § 1920

and "all reasonable out-of-pocket expenses that are normally charged to clients." *O'Grady v. Mohawk Finishing Prods., Inc.*, No. 96–CV–1945, 1999 WL 30988, at *7 (N.D.N.Y. Jan. 15, 1999) (Scullin, J.); *see also LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998); *Hogan*, 144 F.Supp.2d at 143. Ordinary overhead expenses are not recoverable. *LeBlanc–Sternberg*, 143 F.3d at 763. Whether a particular item constitutes ordinary overhead or an awardable cost depends on whether the item is one normally absorbed within the attorney's fee or separately charged to a client. *See id.* Defendants challenge various costs claimed by plaintiffs.

### a. Fees for the Depositions of Defendants' Experts

██ Plaintiffs seek a total of $7,350.00 for fees paid to defendants' two expert witnesses as fees for their depositions. DuCharme Aff., Ex. F at 4. Such costs are those incurred in obtaining discovery, such as the costs of a stenographer or a witness' travel, and are normally charged to a client. Accordingly, plaintiffs are awarded such costs.

### b. Computerized Research

Plaintiffs seek an award of $350.18 for computer research. DuCharme Aff., Ex. F at 2–7. Such costs are not compensable on this record. *See United States ex rel. Evergreen Pipeline Constr. v. Merritt–Meridian Constr. Corp.*, 95 F.3d 153, 173 (2d Cir.1996); *Tanzini*, 978 F.Supp. at 85 (holding that costs of computer research not compensable "in the absence of an hour/rate showing by plaintiff"). Accord-

ingly, the costs claimed by plaintiffs will be reduced by $350.18.

### c. Supplies

Plaintiffs seek $458.23 [33] for exhibit tabs and binders. Defs. Mem. of Law at 9 & n. 4. Such costs constitute routine office overhead and are not compensable here. The amount of $458.23 will be deducted from the costs claimed by plaintiffs.

### d. Photocopies

Plaintiffs seek a total of $24,438.00 for photocopying 97,752 pages of documents in this case, a rate of $.25 per page. DuCharme Aff., Ex. F at 7. Defendants challenge both the sufficiency of the documentation for this claim and the page rate of $.25 claimed by plaintiffs. Defs. Mem. of Law at 9–10.

Plaintiffs' description of this item states in total as follows: "12/15/00—Copy charge at $.25 per sheet × 97,752 sheets— $24,438.00." No supporting documentation or affidavit describing this claim is included. While the documents and, therefore, the photocopying in this case was substantial, it cannot be determined from plaintiffs' submissions whether a portion of the photocopying claimed was for the convenience of counsel or the plaintiffs or was otherwise unnecessary to the litigation.[34] Accordingly, the number of photocopies for which plaintiffs claim reimbursement will be reduced to 75,000. *See Baker v. Power Securities Corp.*, 174 F.R.D. 292, 295 (W.D.N.Y.1997) (reducing amount claimed for photocopying costs for insufficient documentation).

██ Plaintiffs claim photocopying costs at the rate of $.25 per page. Plaintiffs

---

**33.** Plaintiffs claim $297.05 for "copying and exhibit binders" on 9/9/00. DuCharme Aff., Ex. F at 6. In the absence of itemization, this charge is divided evenly between copying and binders.

**34.** A reduction for that portion of the costs attributable to the ten plaintiffs who did not prevail or have settled their claims is discussed *infra* at subsection h.

have submitted no supporting documentation for this rate in the form of rates normally charged in this region for outside or in-office copying or the rate plaintiffs' counsel normally charged its clients for photocopying. Other courts have found photocopying rates of $.10 per page appropriate. *See, e.g., Hogan*, 144 F.Supp.2d at 144; *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F.Supp.2d 417, 426 (S.D.N.Y.1999); *In re Towers Fin. Corp. Noteholders Litigation*, No. 93CIV.0810 (WK)(AJP), 1997 WL 5904, at *1 (S.D.N.Y. Jan. 8, 1997). Multiplying 75,000 pages by $.10 yields a compensable total of $7,500.00. Accordingly, the costs claimed by plaintiffs will be reduced by $16,938.00.

### e. Parking

Plaintiffs seek $515.00 for parking fees incurred by their counsel in attending depositions and court proceedings. *See, e.g.,* DuCharme Aff., Ex. F at 4–7. Defendants contend that such fees are not recoverable. Parking fees are recoverable as litigation costs. *See Kuzma v. I.R.S.*, 821 F.2d 930, 933 (2d Cir.1987) (holding that parking fees "clearly represent the reasonable costs of litigation and are recoverable"). Accordingly, plaintiffs' claim for parking fees will be allowed.

### f. Court–Ordered Payment to Defendants' Expert Witness

Before trial, a schedule was established for the parties to file motions in limine, including any motions regarding expert witnesses. *See, e.g.,* Docket No. 53 (defendants' motion in limine to preclude plaintiffs' expert witness). Plaintiffs made no such motion. During the liability phase, defendants called Dr. Frank Landy, an industrial psychologist, who had previously been disclosed to plaintiffs, to testify as an expert witness. Plaintiffs' counsel for the first time moved to preclude Dr. Landy's testimony. Dr. Landy's testimony was then postponed to permit plaintiffs and defendants to submit briefs on the issue. Docket Nos. 82, 83. As a consequence of their untimely motion, plaintiffs were ordered to reimburse defendants for the costs incurred in Dr. Landy's postponed appearance. Plaintiffs thereafter reimbursed defendants in the amount of $4,196.26. DuCharme Aff., Ex. F at 5. Plaintiffs now claim this payment as a cost of litigation and seek recovery. However, this cost was incurred by plaintiffs' counsel as a result of their failure to file their motion on time. This cost was not an ordinary litigation expense and, because it resulted from counsel's error, could not ordinarily be charged to a client. Accordingly, the costs claimed by plaintiffs will be reduced by $4,196.26.

### g. Lodging

Plaintiffs claim a total of $972.96 for lodging and meals for their counsel in traveling to New York City to defend the depositions of plaintiffs' expert witnesses. DuCharme Aff., Ex. F at 4. Defendants contend that this item lacks sufficient documentation. Defs. Mem. of Law at 11. As defendants note, plaintiffs' claim simply states the total amounts for lodging ($740.96) and meals ($232.00) for the period from May 24–29, 1999. The time records of plaintiffs' counsel indicate that these expenses were incurred by one attorney. *Id.*, Ex. D at 22–23. Thus, plaintiffs' counsel paid $185.24 per night for lodging for four nights in New York City and spent an average of $46.40 per day for five days for meals. Neither amount is unreasonable, their documentation is sufficient here, and plaintiffs will be allowed these costs.

### h. Adjustment of Costs

As noted above, plaintiffs' claims for attorneys' fees was adjusted downward by

plaintiffs to exclude that portion of the fees incurred on behalf of the ten plaintiffs who previously settled their claims or who did not prevail at trial. DuCharme Aff. at ¶¶ 6–8. It does not appear from plaintiffs' motion that any similar exclusion was performed for the costs claimed and that the costs claimed constitute all costs incurred in the litigation. Defendants contend that the costs claimed should be reduced by the portion of those costs attributable to the ten plaintiffs. Defs. Mem. of Law at 7 n. 2. Any costs incurred on behalf of the two nonprevailing plaintiffs are not recoverable here. It is unclear whether the costs incurred on behalf of the eight settling plaintiffs were included in any of their settlement agreements. In the absence of proof that the parties agreed in those settlement agreements that plaintiffs could seek an award for costs incurred on behalf of those eight plaintiffs as part of this motion, plaintiffs have failed to satisfy their burden of demonstrating entitlement to costs on behalf of those plaintiffs.

Accordingly, after the costs claimed by plaintiffs have been reduced in the amounts indicated above, that adjusted claim for costs must be further reduced in accordance with the methodology utilized by plaintiffs to exclude the attorneys' fees incurred on behalf of the ten plaintiffs. Plaintiffs' claim for costs of $58,469.37 must be reduced as indicated above by a total of $21,942.67, yielding an adjusted claim for costs of $36,526.70. The methodology utilized by plaintiffs and accepted by defendants for deducting the portion attributable to the ten plaintiffs requires that this adjusted claim for costs be reduced by 35.71%, or $13,043.68. DuCharme Aff. at ¶ 8. Therefore, plaintiffs are awarded costs in a total amount of $23,483.02.

## V. Conclusion

For the reasons stated above, it is hereby

ORDERED that:

1. Defendants' motion (Docket No. 137) for:

A. Judgment as a matter of law is **DENIED**; and

B. A new trial or remittitur is **DENIED** in all respects except as to the following:

i. Defendants' motion for a new trial on the issue of damages for emotional distress awarded to plaintiffs Raymond E. Adams, Clifford J. Levendusky, Neil R. Pareene, William C. Reynheer, Allen G. Sweet and Carl T. Woodman is **GRANTED** *unless* such plaintiffs file and serve written acceptances of remittitur of the emotional distress components of their damages awards to $125,000 each on or before **March 8, 2002**; and

ii. Defendants' motion for a new trial on the issue of damages for emotional distress awarded to plaintiffs Bruce E. Palmatier and David W. Townsend is **GRANTED** *unless* such plaintiffs file and serve written acceptances of remittitur of the emotional distress components of their damages awards to $175,000 each on or before **March 8, 2002**;

2. Plaintiffs' motion (Docket No. 138) for:

A. Prejudgment interest is **GRANTED** as to plaintiffs' back pay awards and is **DENIED** in all other respects;

B. Postjudgment interest is **GRANTED**; and

C. An upward adjustment of damages for increased taxes is **DENIED**; and

3. Plaintiffs' motion (Docket No. 197) for an award of attorneys' fees and costs incurred through November 22, 2000 is **GRANTED**, and plaintiffs are awarded at-

torneys' fees in the amount of $873,868.09 and costs in the amount of $23,483.02.

**IT IS SO ORDERED.**